2020 IL App (1st) 172578-U
Order filed August 17, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 60160 |
| | ) | |
| MANUEL MARTINEZ, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Griffin and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for aggravated battery with a firearm is affirmed where the evidence was sufficient to sustain the conviction. Defendant's prosecutorial misconduct and ineffective assistance of counsel claims fail for lack of prejudice.

¶ 2    Following a bench trial, Manuel Martinez was found guilty of aggravated battery with a firearm (count I), aggravated discharge of a firearm (count II), and aggravated fleeing or attempting to elude a peace officer (count III). The court sentenced Martinez to 15 years' imprisonment for count I, along with a concurrent three-year sentence for count III. Martinez appeals, arguing that (i) the evidence was insufficient to prove him guilty of aggravated battery with a firearm or

aggravated discharge of a firearm beyond a reasonable doubt, (ii) the State committed prosecutorial misconduct by mischaracterizing an expert witness's testimony, and (iii) defense counsel provided ineffective assistance by failing to object and adopting the mischaracterization.

¶ 3    We affirm. We find, based on this record, that a rational factfinder could have found Martinez guilty of aggravated battery beyond a reasonable doubt. As to the conviction for aggravated discharge, the trial court did not sentence Martinez for aggravated discharge and no final judgment was entered on that offense. Accordingly, we lack jurisdiction to consider the finding of guilt. Finally, even accepting that the prosecutor and the trial court overstated the evidence in stating that Martinez's tests were "positive" for GSR, Martinez has not shown that he was prejudiced by trial counsel's conduct in failing to object.

¶ 4                                    Background

¶ 5    Martinez was charged by indictment with one count each of aggravated battery with a firearm (aggravated battery) (720 ILCS 5/12-3.05(e)(1) (West 2014)) (count I), aggravated discharge of a firearm (aggravated discharge) (720 ILCS 5/24-1.2(a)(1) (West 2014)) (count II), and aggravated fleeing or attempting to elude a peace officer (aggravated fleeing) (625 ILCS 5/11-204.1(a)(1) (West 2014)) (count III). During opening statements, the prosecutor asserted that Martinez was tested for gunshot residue (GSR) following his arrest and "both of his hands were positive." Defense counsel posited that neither a firearm nor GSR was found in Martinez's vehicle, but did not respond to the State's claim that Martinez's hands tested positive for GSR.

¶ 6    At trial, Meriam Enriquez testified through a Spanish interpreter that on May 26, 2015, she lived with her husband, her son Sergio Enriquez, and her three grandchildren. (Because Meriam Enriquez and Sergio Enriquez have the same last name, we will refer to them by their first names.)

The street on which they live runs one way from north to south. That evening, Sergio returned from the grocery store around 10 p.m. He parked in their garage, entered the house, and told Meriam that he had an "incident." Sergio left the house to call the police, while Meriam remained in the living room with her husband, who left the room shortly afterwards.

¶ 7    From the living room window, Meriam saw a white vehicle approaching the house from the north. The blinds were open and no other vehicles were in front of the house. Meriam saw a hand emerge from the driver's window and then saw a light, heard a loud noise like "fireworks," and felt something on her face. Meriam yelled to her husband, "[t]hey shot me." She did not see the driver and did not know whether anyone else was in the vehicle.

¶ 8    Meriam went to the hospital and received treatment for a gunshot wound to her face. The bullet entered behind her ear and lodged near her spine. The State introduced photographs that showed the exterior and interior of the home following the shooting, which Meriam identified, including People's Group Exhibit 3A. The photographs depicted multiple bullet holes in the windows, walls, and furniture in the living room.

¶ 9    On cross-examination, Meriam stated that she did not recognize Martinez and had never seen him before. While hospitalized, Meriam told Chicago police officers that she heard a gunshot, stood up, saw a white vehicle, then saw a hand emerge from the vehicle. Defense counsel showed Meriam People's Group Exhibit 3A, and she testified that though the blinds of her living room window were closed in Exhibit 3A, they were open when she saw the vehicle.

¶ 10    Meriam could not recall how much time elapsed between when Sergio reported an "incident" and the shooting. She did not know how many shots were fired but noticed five bullet holes in her window when she returned from the hospital.

¶ 11    Sergio testified he returned home from work that evening at around 6 p.m., and later he and his son went to the grocery store for one to two hours. When they returned, Sergio double-parked in front of the house to unload the groceries, then drove to the alley behind the house to park in his garage. While doing so, Sergio noticed a white Intrepid nearby, which he recognized as Martinez's. When the Intrepid was two car lengths behind Sergio, he saw that Martinez was the driver. Sergio met Martinez in the summer of 2014 through Martinez's then-girlfriend, Erika. Since then, Sergio saw Martinez driving the Intrepid, but did not interact with him. Sergio pulled into the alley and saw his neighbor, Joshua Curtis. Before parking, Sergio drove up to Curtis and said, "[k]eep an eye on the car behind me. I think he's following me."

¶ 12    Sergio parked, got out, and saw the Intrepid stopped near a neighboring garage. There was a passenger with Martinez whom Sergio did not recognize. Martinez got out of the Intrepid from the driver's seat, then leaned toward the car as though he were "hiding something." Martinez and Sergio "confronted each other," with Martinez saying repeatedly, "[y]ou know what this is about." Sergio construed this statement to mean that Martinez believed Sergio and Erika were dating. Martinez and the passenger tried to "surround" Sergio.

¶ 13    Sergio yelled for Curtis, who approached with two other men and confronted Martinez and the passenger. Sergio ran into his garage and closed the door. He heard Martinez yell, "You're marked *** I know where you live."

¶ 14    Sergio told his parents about the incident and called his friend, a police officer, who advised him to call the police. He called the police from his yard. During the call, Sergio saw the Intrepid pull in front of his house. He then heard "shots," and Meriam yell. Sergio ran into the house and

found Meriam on the floor, then ran to the front door and saw the Intrepid driving away northbound.

¶ 15    Later that night, Chicago police officers arrived at the house with Martinez in custody. Sergio identified him as the person he encountered in the alley. On May 27, 2015, Sergio again identified Martinez in a photo array at the police station. Sergio identified People's Group Exhibit 1A through 1D as photographs depicting the white Intrepid, though the photographs showed damage that was not present during the confrontation in the alley.

¶ 16    On cross-examination, Sergio said that he did not know the Intrepid's license plate number. He was not certain that People's Group Exhibit 1A through 1D depicted the Intrepid Martinez was driving on May 26, 2015. When Sergio left his garage after parking, the Intrepid's passenger approached him first while Martinez was "fidgeting in his car." Sergio's neighbors approached about one minute after Martinez and the passenger had gotten out of their car.

¶ 17    Sergio called the police 10 to 15 minutes after the incident in the alley. He knew the Intrepid had stopped in front of his house because he saw its brake lights. His father came outside to ask about the call, and Sergio pointed to the Intrepid and told his father "he is right there" before hearing shots. Sergio did not know how many people were in the car when it stopped in front of his house.

¶ 18    Chicago police officer Edgar Garcia testified that he and his partner were in a marked car, at around 10 p.m., when a civilian on 35th Street and Honore waived to them. Following a conversation, the officers followed a white Intrepid on 35th towards Damen Avenue. The officers curbed it near the on-ramp for I-55. As the officers got out, the Intrepid crossed the median and drove away southbound on I-55. The officers pursued the Intrepid above the speed limit until it

crashed into a retaining wall near the I-294 exit ramp. Garcia identified Martinez in court as the driver and sole occupant. The officers arrested Martinez and took him to the scene of the shooting, where Sergio identified him. On cross-examination, Garcia testified that he searched the Intrepid and did not find a firearm or shell casings.

¶ 19    Detective Robert Graves testified that on May 26, 2015, at 11:55 p.m., he retrieved samples for GSR testing from Martinez's hands. On cross-examination, Graves said he took samples from "all areas consistent of where somebody would be holding a handgun." Martinez was in a police station interview room when Graves collected the samples. Martinez's hands were not "bagged," and he could have touched the bench on which he was seated.

¶ 20    Chicago police officer Zbigniew Niewdach testified that on June 2, 2015, he took photographs of a 2003 Dodge Intrepid at the police impound lot and identified People's Group Exhibit 6A through 6D as those photographs. He also administered a GSR kit to the "area above the seating area, the interior side of the driver door, and the back seat and head rest of the driver seat."

¶ 21    On cross-examination, Niewdach testified that the Intrepid's driver's side window was down, and the car had front-end damage. He took samples from the driver's seat head rest but not the steering wheel.

¶ 22    Mary Wong, a forensic scientist with the Illinois State Police, testified as an expert in GSR analysis. Wong explained that GSR is "anything that is discharged from a firearm," including smokeless powder, lubricants, or cleaners, as well as primer and metal shavings. GSR particles are characterized by shape and composition. Respecting composition, there are three elements of interest—lead, barium, and antimony—that create seven possible combinations. Six combinations

are considered "consistent" with GSR, and a seventh combination containing all three elements is "usually found" when a firearm has been discharged.

¶ 23    GSR is deposited on someone's hands due to a gaseous cloud from "mini explosions" caused by a discharged firearm. As the "cloud cools," GSR particles form and may deposit on nearby surfaces. An individual can be identified as having possibly discharged a firearm by the "presence of three tri-component particles that contain all three elements." If someone shot a firearm outside of a moving vehicle, the possibility of GSR deposit is reduced. Movement, handwashing, and the passage of time also may reduce the chances of GSR deposits. The collection window is six hours.

¶ 24    Wong examined the GSR kit from the Intrepid. She concluded that the "sample areas may not have been in the vicinity of a discharged firearm or may not have contacted a primer gunshot residue related item." She also examined the GSR kit for Martinez's hands and concluded that Martinez "may have discharged a firearm, may have been in the environment of a discharged firearm, may have come in contact with a primer gunshot residue related item, or may have received the particles from an environmental source."

¶ 25    On cross-examination, Wong said she repeated the test on the sample from Martinez's left hand because she initially found "two tri-component particles present on the left hand" and "one tri-component particle on the right hand." She confirmed that it is possible to return a result that indicates a minimum of three tri-component particles and additional particles consistent with primary GSR, but she was not able to make that finding based on Martinez's samples. Instead, her findings indicated that Martinez may have discharged a firearm. Another possibility was that Martinez was in the "environment of a discharged firearm," a range of 3 to 12 feet. It was also

possible that the particles could have come from the environment rather than a discharged firearm. A person can pick up GSR from touching a surface, an inanimate object, and from hand-to-hand contact with another person. The more activity the surface has, the more likely that GSR particles will be lost.

¶ 26    On redirect, the State asked Wong whether a GSR test could indicate that a subject "may not have discharged [a] firearm." Wong agreed, but confirmed that her conclusion was that Martinez "may have" fired a weapon, been in the environment of a fired weapon, contacted GSR or an item with GSR, or received the particles from the environment.

¶ 27    Daniel Gonzales testified that at the time of trial, he was on felony probation for aggravated driving under the influence. On May 26, 2015, sometime after 10 p.m., he was near Wolcott Avenue and 35th with his three-year-old daughter, his girlfriend, and his girlfriend's eight-year-old sister when he heard seven to nine gunshots south of their location. Gonzales told his daughter, his girlfriend, and his girlfriend's sister to hide and then went to the middle of 35th and Wolcott. He looked south and saw a white car facing the "wrong way" with the engine running, its lights off, and no one inside. The car was 9 to 10 houses from Gonzales. He walked towards the sidewalk, looked back towards the car, and saw one person, a "big figure," run from the gangway, enter the driver's seat, and drive towards Gonzales.

¶ 28    The car approached at a high rate of speed, then stopped when it reached the corner of 35th and Wolcott. Gonzales saw the driver at this point and identified him as Martinez in court. Gonzales also determined that the car was a Dodge Intrepid. Martinez turned left towards 35th and Damen. Gonzales waived down a police patrol car and informed the officers that the "the white

car making a right on 35th and Damen just was involved in a shooting." The officers pursued the car.

¶ 29 Gonzales identified Martinez in a photo array conducted the next morning at the police station. Gonzales also identified the photographs in People's Group Exhibit No. 6A through 6C as depicting the same car he saw during the incident, though the photographs depicted damage to the car that was not present when Gonzales saw it.

¶ 30 On cross-examination, Gonzales stated that the white Intrepid was double-parked when he first saw it. About 15 to 20 seconds elapsed from the time he directed his daughter, his girlfriend, and his girlfriend's sister to take shelter until he went to the middle of the street and saw the white Intrepid. He saw Martinez run to the Intrepid 10 seconds later. The car was located "more or less towards the 3600 block of Wolcott."

¶ 31 Joshua Curtis testified that Sergio is his neighbor and the two had been friends for around 10 years at the time of trial. On the night of May 26, Curtis was in his garage when he saw a white car drive down the alley and heard Sergio call Curtis's name. Curtis looked up and saw a "confrontation" in the alley near Sergio's garage, with two men surrounding Sergio. Curtis did not see their faces clearly. Curtis, his father, and a neighbor approached. The two men surrounding Sergio "started to get back into the car" and "took off down the alley." Later, Curtis heard gunshots and immediately afterwards noticed a white car driving northbound on Honore towards 35th. He believed the car was the same used by the two men in the alley.

¶ 32 On cross-examination, Curtis stated that he heard the gunshots about 45 minutes to an hour after the incident in the alley, which occurred around 10 p.m., but he did not check the time on his cell phone.

¶ 33    During closing arguments, defense counsel noted discrepancies between Sergio's and Curtis's timeframes of events, and between Gonzales's testimony that he saw a white car on Wolcott and the testimony of other witnesses who placed it on Honore during the shooting. Counsel emphasized that officers did not locate a firearm or shell casings, and that "the gunshot residue tests were positive for the Martinez's hands, the back of his hands, but negative for the vehicle." Counsel argued that Martinez may have picked up the GSR particles from the police station bench or from being 3 to 10 feet from a discharged firearm, but the presence of GSR "is no indication that he personally fired the gun."

¶ 34    The prosecutor argued in rebuttal that the witnesses' timelines did not significantly conflict. She noted Wong testified that "Martinez's hands were positive for gunshot residue," and suggested the Intrepid may not have tested positive as it was tested six days after the incident. The prosecutor further argued that Martinez may have disposed of the firearm in the time between the shots and when Gonzales saw Martinez enter the car, and that "[t]he fact that there was no gun in the vehicle does not mean [Martinez] did not shoot a firearms." She characterized as "mere speculation" the contention that Martinez's hands contacted GSR from the police station bench. She also pointed to testimony regarding Martinez's motive and flight.

¶ 35    The trial court found Martinez guilty of all charges. The court said Martinez, while driving a white Intrepid, confronted Sergio near his family's house shortly before the shooting. Witness testimony placed that same car outside the house during the shooting, and also established it then immediately left the area. Garcia testified that after being informed that the car was involved in a shooting, he curbed it, but the driver drove off and then crashed into a retaining wall. Martinez

was the driver and sole occupant. The court noted GSR "present" on Martinez's hand, and that no firearm was recovered was not enough to create reasonable doubt.

¶ 36   Defense counsel filed a motion for a new trial alleging that Martinez was not proven guilty beyond a reasonable doubt. In summarizing the trial evidence, counsel submitted that Wong "stated that the test performed *** on [Martinez] was positive," indicating that Martinez "may have recently fired a weapon, been in the vicinity (3-12 feet) of a weapon that was fired, or been exposed to similar elements in the environment." Counsel argued, however, that the State failed to show that Martinez shot Meriam where "no shell casings, no weapon and no [GSR] were recovered from the vehicle."

¶ 37   During a hearing on the motion, defense counsel argued, "The State presented evidence that there was primer gunshot residue recovered from [Martinez's] hands but there was no primer gunshot residue recovered from the vehicle when it was tested a week after the incident." He also reiterated that the officers did not recover a firearm. In response, the prosecutor said Martinez's "hands had positive GSR on them." The court stated the lack of GSR from the Intrepid "does not eliminate *** all the evidence in the case, and especially the fact that [Martinez] has gunshot residue on his hands." The court added, "[h]aving gunshot residue on your hands" was more important to its conclusion that Martinez fired a weapon than the lack of GSR in the Intrepid. The court emphasized the evidence regarding Martinez's conduct in the alley, the "corroborated" identification of Martinez, and that Martinez's flight only stopped because of the crash. Though the State's case contained "discrepancies," the court found the witnesses perceived gunshots and a vehicle fleeing the scene of the shooting, and "minor variations in the testimony *** do not rise to the level of a reasonable doubt."

- 11 -

¶ 38 After a sentencing hearing, the court sentenced Martinez to 15 years' imprisonment for aggravated battery. The court also imposed a concurrent three-year sentence for aggravated fleeing and denied Martinez's motion to reconsider sentence.

¶ 39                                         Analysis

¶ 40 On appeal, Martinez first argues that the State failed to prove him guilty of aggravated battery or aggravated discharge where the evidence was only circumstantial and did not support the inference that Martinez, rather than his passenger or a third party, was the shooter.

¶ 41                          *Aggravated Discharge Conviction*

¶ 42 As an initial matter, we observe that the trial court did not sentence Martinez for aggravated discharge, and therefore, no final judgment was entered as to that offense. Consequently, this court lacks jurisdiction to consider that finding of guilt. See *People v. Flores*, 128 Ill. 2d 66, 95 (1989) ("it is axiomatic that there is no final judgment in a criminal case until the imposition of sentence, and, in the absence of a final judgment, an appeal cannot be entertained").

¶ 43 Moreover, we also lack jurisdiction to remand for sentencing on aggravated discharge. As our supreme court explained in *People v. Relerford*, 2017 IL 121094, an appellate court generally has no jurisdiction to remand for sentencing on unsentenced counts except in specific circumstances, as when the circuit court "determined, albeit incorrectly, that sentences could not be imposed on *** lesser offenses because they merged into the other offenses." *Relerford*, 2017 IL 121094, ¶¶ 73-74 (citing *People v. Dixon*, 91 Ill. 2d 346 (1982)). When, as here, there is no "explanation for the circuit court's failure to impose" sentence on a particular offense, this exception does not apply. *Id.* ¶ 74. Thus, we do not have jurisdiction to remand this case for

sentencing on the aggravated discharge count. Accordingly, we only consider Martinez's challenge to his conviction for aggravated battery.

¶ 44                                    *Aggravated Battery Conviction*

¶ 45    When reviewing a challenge to the sufficiency of the evidence, the reviewing court construes the evidence in the light most favorable to the State and determines whether any rational factfinder could have found the defendant guilty beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The reviewing court must defer to the factfinder on matters of witness credibility and the weight of the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). The factfinder is "not required to disregard inferences which flow normally from the evidence before it," nor must it "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Reversal is improper unless the evidence is so "unreasonable, improbable, or unsatisfactory" that it creates reasonable doubt of the defendant's guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 46    Relevant here, to prove aggravated battery, the State had to show that Martinez, in "committing a battery," knowingly discharged a firearm and caused an injury to another person. 720 ILCS 5/12-3.05(e)(1) (West 2014).

¶ 47    At trial, Sergio testified to seeing Martinez driving a white Intrepid near the alley behind his house. According to Sergio, Martinez believed Sergio and Martinez's ex-girlfriend were dating, and Martinez appeared to hide an item as he got out of the car. Martinez said, "You're marked *** I know where you live." Curtis also identified Martinez's car as a white Intrepid, and both Sergio and Curtis testified that an incident occurred in the alley between Sergio, Martinez, and another man who was with Martinez. Afterwards, while Sergio was outside calling the police, he saw the

white Intrepid pull in front of his house and then immediately heard gunshots. Meriam saw a white car pull in front of her house moments before she was shot. Curtis testified that the same car from the alley drove away from outside Sergio's home immediately after the gunshots.

¶ 48    Gonzales testified that he was on foot near 35th and Wolcott when he heard gunshots and saw a white car in the middle of the street. Moments later, someone ran into the driver's seat and drove towards Gonzales's location, stopping close enough to Gonzales that he saw the driver's face. He identified Martinez as the driver and testified that Martinez was the lone occupant. Gonzales alerted police. Garcia confirmed that he and his partner curbed a white Intrepid near the location of the shooting, which then fled from the stop. They pursued the car, which soon crashed into a retaining wall. The officers arrested Martinez, the driver and lone occupant. They took him to the location of the shooting, where Sergio identified him.

¶ 49    After his arrest, Martinez's hands were tested for GSR. Wong testified that Martinez had particles on his hands indicating that he "may have discharged a firearm, may have been in the environment of a discharged firearm, may have come in contact with a primer gunshot residue related item, or may have received the particles from an environmental source."

¶ 50    We find that a rational factfinder could have found Martinez guilty of aggravated battery beyond a reasonable doubt based on this record. Martinez argues that there is no direct evidence that he fired the shot that injured Meriam, but circumstantial evidence alone can sustain a conviction. *Jackson*, 232 Ill. 2d at 281. The circumstantial evidence at trial included testimony that Martinez drove a white Intrepid before the shooting and a white car was outside Meriam's home during the shooting. Meriam testified that the shots originated from the white car. Gonzales saw Martinez enter a white car right after the shots were fired. Martinez was arrested in the driver's

- 14 -

seat of a white Intrepid after a chase immediately following the shooting and was the sole occupant. A test conducted on Martinez's hands a few hours after the shooting revealed particles consistent with GSR. The inference that Martinez shot Meriam naturally flows from this evidence, and though the firearm was not recovered with Martinez in the Intrepid, the trial court was not required to elevate any theory of innocence to the level of reasonable doubt. *Id.* Rather, "[i]t is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *Id.*

¶ 51    Additionally, there was motive evidence, specifically that Martinez was upset because he believed Sergio and his ex-girlfriend were dating. This constitutes competent evidence from which a factfinder may infer guilt. See *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 37 (evidence of motive is competent to show it was "more probable that the defendant was the individual who killed" the victim).

¶ 52    We acknowledge, as the trial court did during the hearing on Martinez's motion for a new trial, that discrepancies in the testimony exist, but these discrepancies do not create reasonable doubt of guilt. That Curtis and Sergio conflicted over whether the shooting occurred 10 to 15 minutes or 45 minutes after the incident in the alley is not so significant a difference that a rational factfinder would have to weigh it over consistent testimony regarding the shooting. Similarly, that Gonzales testified that the white car was on Wolcott during the shooting while Curtis, Sergio, and Meriam placed it on Honore does not discredit the remainder of Gonzales's testimony, much of which was corroborated by the other witnesses. A rational factfinder could have considered these discrepancies minor, as the court did, and find Martinez guilty beyond a reasonable doubt.

¶ 53    *Prosecutor's Characterization of Expert Witness's Testimony and Defense*

*Counsel's Alleged Ineffective Assistance*

¶ 54    Martinez next argues that the prosecutor overstated Wong's testimony, and thus committed misconduct, by describing the GSR tests of Martinez's hands as "positive." According to Martinez, the particles on his hands did not conclusively indicate that he contacted a recently discharge firearm, and the samples Wong studied did not contain enough particles to indicate that they more likely originated from a firearm rather than an environmental source. Martinez further argues that the prosecutor's error was compounded where defense counsel did not object, and both defense counsel and the trial court also misstated Wong's testimony.

¶ 55    Because Martinez argues that defense counsel's failure to object to the prosecutor's misstatement constituted ineffective assistance, we may reach the issue even though it was not preserved through a timely objection and inclusion in a posttrial motion. See *People v. Moore*, 356 Ill. App. 3d 117, 121 (2005) (where trial counsel did not challenge prosecutor's allegedly improper argument, "we will consider this issue, which otherwise would be waived, because defendant contends the failure to object during trial and to preserve the issue in a posttrial motion was due to ineffective assistance of counsel.").

¶ 56    A criminal defendant is entitled to effective assistance of trial counsel. U.S. Const., amend. VI. A defendant complaining of ineffective assistance must show that trial counsel's conduct was deficient, and defendant suffered prejudice as a result. *People v. Brown*, 2017 IL 121681, ¶ 25 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To establish prejudice, the defendant must demonstrate a reasonable probability that the outcome of the trial would have been different had the deficient conduct not occurred. *People v. Peterson*, 2017 IL 120331, ¶ 79. "If a reviewing court

finds that the defendant did not suffer prejudice, it need not decide whether counsel's performance was constitutionally deficient." *People v. Buss*, 187 Ill. 2d 144, 213 (1999).

¶ 57    Martinez alleges that counsel was ineffective for failing to object when the prosecutor allegedly misstated expert testimony. It is improper for a prosecutor to misstate or overstate the conclusions of an expert witness, and this conduct may justify reversal where the defendant can demonstrate that the verdict likely would have been different had the misstatement or overstatement been excluded from the record. See *People v. Linscott*, 142 Ill. 2d 22, 28-34 (1991).

¶ 58    Turning to the record, the prosecutor stated during her opening statement that both of Martinez's hands "were positive" for GSR. Defense counsel did not object to this characterization of the expected evidence. Wong, in turn, testified that a person can be identified as having fired a weapon by the "presence of three tri-component particles that contain all three elements" associated with GSR, and that she found two tri-component particles on Martinez's left hand test and one tri-component particle on his right hand test. According to Wong, Martinez "may have discharged a firearm, may have been in the environment of a discharged firearm, may have come in contact with a primer gunshot residue related item, or may have received the particles from an environmental source." During rebuttal closing argument, the prosecutor stated that Martinez's hands were "positive for gunshot residue." Defense counsel also stated that GSR testing was "positive" for Martinez's hands in closing argument. The trial court found that GSR was "present" on Martinez's hands, and in denying Martinez's motion for a new trial, described the presence of GSR on Martinez's hands as a "fact."

¶ 59    Wong did not conclude that the GSR testing conclusively showed that the particles found on Martinez's hands originated from a discharged firearm. Rather, the GSR tests revealed particles

that were consistent with Martinez discharging a firearm or being 3 to 12 feet of a discharged firearm. Wong also testified that the particles may have deposited on Martinez's hands from an environmental source unrelated to a firearm. Thus, the tests were positive for particles that were consistent with originating from GSR, but not exclusive to GSR.

¶ 60    Even accepting that the prosecutor and the trial court overstated the evidence in saying that Martinez's tests were "positive" for GSR, Martinez has not shown that he was prejudiced by trial counsel's conduct in failing to object. The State presented more than enough evidence outside of the GSR results to sustain the court's findings, including (i) multiple witness accounts of Martinez driving a white car and confronting Sergio shortly before the shooting, (ii) multiple witness accounts of a white car being in close vicinity to the house immediately before and immediately after the shooting, (iii) Martinez's flight from the area of the shooting in a white vehicle, and (iv) Martinez's motive to injure Sergio. So, there is not a reasonable probability that the outcome of the trial would have been different had the GSR tests of Martinez's hands never been described as "positive." See *People v. Harris*, 2017 IL App (1st) 140777, ¶¶ 61-64 (finding that although certain statements by prosecutor improper, reversal was not required because there was "ample" evidence supporting guilty verdict). For the same reason that Martinez cannot demonstrate prejudice from counsel's failure to object to the prosecutor's statements, his claim that counsel was ineffective for describing the GSR testing in similar terms fails.

¶ 61    The evidence at trial sufficed to sustain the trial court's ruling in finding Martinez guilty of aggravated battery, and his ineffective assistance of counsel claim fails because he cannot establish prejudice.

¶ 62    Affirmed.