2025 IL App (1st) 240823-U

No. 1-24-0823

Order filed September 19, 2025

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 60160 |
| | ) | |
| MANUEL MARTINEZ, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Pucinski and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Denial of defendant's motion for DNA testing affirmed where defendant failed to show that testing would produce new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 2    Manuel Martinez appeals from the denial of his *pro se* motion for forensic testing of a shell casing under section 116-3 of the Code of Criminal Procedure (Code) (725 ILCS 5/116–3 (West 2020)). He raises several reasons for reversing the denial of his motion: (i) the requested testing was not performed at the time of trial, (ii) the offender's identity was the central issue at trial, (iii)

the shell casing has been subject to a secure chain of custody, and (iv) the requested testing has the potential to produce new, noncumulative evidence that is materially relevant to his claim of actual innocence.

¶ 3    We affirm. The circuit court appropriately denied Martinez's motion for DNA testing, as the overwhelming evidence of his guilt rendered results from testing the shell casing irrelevant to his claim of innocence.

¶ 4                                    Background

¶ 5    Martinez's convictions stem from a May 26, 2015, drive-by shooting. Martinez was charged with one count each of aggravated battery with a firearm, aggravated discharge of a firearm, and aggravated fleeing or attempting to elude a peace officer. After a bench trial, he was found guilty of all three offenses and sentenced to 15 years' imprisonment for aggravated battery and to a concurrent term of three years' imprisonment for aggravated fleeing.

¶ 6    In his direct appeal, we affirmed the convictions for aggravated battery and aggravated fleeing. See *People v. Martinez*, 2020 IL App (1st) 172578-U. We noted that we lacked jurisdiction to review the finding of guilt on aggravated discharge as the trial court did not impose a sentence on that count.

¶ 7                                  *Trial Evidence*

¶ 8    We detailed the trial evidence in our 2020 order. So, we will only present the facts necessary to resolve this appeal.

¶ 9    On the evening of May 26, 2015, Meriam Enriquez was shot while inside her house. She lived there with her husband, her son Sergio Enriquez, and her grandchildren. She testified that around 10 p.m., her son returned from the grocery store and told her that he had an "incident." He

left the house to call the police while she remained in the living room. Soon after, looking out the living room window, she saw a white car approaching her home, a hand emerge from the driver's side window, followed by a flash, heard a loud noise, and then felt something on her face. She had been shot.

¶ 10    Sergio testified that earlier that evening, while he drove to the alley behind the house to park in the garage, he noticed a white Intrepid following him. He recognized the Intrepid as belonging to Martinez and the driver as Martinez. After pulling into the alley, he saw his neighbor Joshua Curtis and asked him to "[k]eep an eye on the car behind me. I think he's following me."

¶ 11    Once parked, Sergio noticed that the Intrepid had stopped, and there was a passenger. Martinez got out of the Intrepid from the driver's seat and leaned toward the car as though he was "hiding something." Martinez and Sergio "confronted each other," with Martinez saying repeatedly, "[y]ou know what this is about." Sergio understood this to mean that Martinez believed he was dating Martinez's ex-girlfriend, Erika. Martinez and his passenger tried to surround Sergio, prompting him to call out for Curtis. As Curtis approached, Sergio ran into the garage and heard Martinez yell, "You're marked, *** I know where you live."

¶ 12    Sergio informed his parents about the incident before calling the police from the yard. While outside, he saw a white Intrepid heading northbound in front of his residence and then heard gunshots. He rushed inside to find his mother on the floor and, looking out the front door, saw the Intrepid continue northbound.

¶ 13    Curtis heard the gunshots from his garage five houses north of the Enriquez house. Looking through the gangway, Curtis recognized the same Intrepid from the earlier encounter in the alley heading northbound toward 35th Street.

¶ 14    Daniel Gonzales heard the gunshots while walking along 35th Street, about one and a half blocks north and one block west of the shooting. He looked south on Wolcott and saw "a big figure" leaving the gangway and entering the driver's side of "a white vehicle facing the wrong way [on Wolcott] with its lights off, engine still running but nobody inside it." As the car headed north on Wolcott, Gonzales identified it as a white Intrepid and saw Martinez in the driver's seat. The Intrepid turned west on 35th Street. Gonzales flagged down Chicago police officer Edgar Garcia and his partner, informing them he believed the Intrepid had just been involved in a shooting.

¶ 15    The officers pursued the Intrepid northbound, initiating a high-speed chase on I-55. Eventually, the Intrepid crashed near the I-294 toll plaza. The officers found Martinez alone in the Intrepid. After searching the car, they did not find a handgun or shell casings. They took Martinez into custody and brought him to the Enriquez residence, where Sergio identified him.

¶ 16    The next day, Sergio and Gonzales independently identified Martinez in a photo array at the police station. They also identified an image of the damaged Intrepid.

¶ 17    Chicago police detective Robert Graves administered a gunshot residue (GSR) kit to Martinez's hands at Area Central. Officer Graves noted that Martinez's hands were not "bagged," which meant Martinez could have touched nearby surfaces.

¶ 18    On June 2, 2015, Chicago police officer Zbigniew Niewdach took photographs of the Intrepid at the impound lot and administered a GSR kit to the car, collecting samples from the driver's side headliner above the seating area, the interior side of the driver door, and the seat back and headrest of the driver's seat. Niewdach did not retrieve samples from the steering wheel.

¶ 19    Mary Wong, an Illinois State Police forensic scientist, testified as a GSR analysis expert. She explained that less GSR collects on a person's hands when firing a gun from a moving vehicle because hand movement can disperse residue. Activities like moving, touching surfaces, or washing hands can further reduce GSR particle deposits. She testified that "The collection window [for GSR] is six hours" and the more time passes, the loss of the particles is exponential.

¶ 20    Wong analyzed the GSR samples from Martinez's hands and the Intrepid. She concluded that Martinez "may have discharged a firearm, may have been in the environment of a discharged firearm, may have come in contact with a primer gunshot residue-related item, or may have received the particles from an environmental source." She noted that the sample from the Intrepid might not have been near a discharged firearm.

¶ 21    On cross-examination, Wong reiterated that her findings suggested that Martinez may have discharged a firearm, been in the vicinity of one at a distance of three to twelve feet, or that the particles on his hands could have come from the environment. She added that the greater the activity, the greater the likelihood of losing GSR particles.

¶ 22    In finding Martinez guilty, the trial court noted that (i) Martinez was the aggressor in the alleyway behind the Enriquez residence, threatening Sergio and demonstrating motive, (ii) Martinez was identified in the alleyway as the driver of the white Intrepid, (iii) the Intrepid was later seen in front of the Enriquez residence, (iv) a muzzle flash emerged from the Intrepid, (v) the Intrepid sped away from the scene, and (vi) Martinez was alone when the police curbed his car.

¶ 23    The court concluded that even without direct evidence identifying Martinez as the shooter or driver, the evidence established his accountability based on "his motive; his threats; his being the driver of the car; his threat – you know, I know where you live. You're marked." The trial

court convicted Martinez on all counts and sentenced him on the aggravated battery and aggravated fleeing counts. We affirmed. *Martinez*, 2020 IL App (1st) 172578-U.

¶ 24                          *Martinez's Motion for Forensic Testing*

¶ 25    In 2021, Martinez filed a combined *pro se* petition for relief under the Post-Conviction Hearing (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), and *pro se* pleading titled "Defendant's Motion for Forensic Testing Not Available at Trial regarding Actual Innocence Pursuant to 725 ILCS 5/116-3." Only the motion for forensic testing is at issue here.

¶ 26    In the motion, Martinez sought forensic testing of previously untested evidence under section 116-3 of the Code. Specifically, he sought forensic testing of one item included in "inventory # 13448413": an expended shell casing from a 9 mm Luger, retrieved from the street near the scene of the shooting. In his motion, Martinez alleged that the shell casing matched the caliber of the firearm used in the shooting, but police never tested the casing for DNA or fingerprints nor found a firearm. Martinez further alleged that the shell casing remained preserved in police inventory and was suitable for testing. He maintained that the DNA and latent print testing of the shell casing would produce newly discovered noncumulative evidence of actual innocence. Martinez attached as an exhibit the evidence list from police inventory, listing the expended shell casing as "Inventory # 13448413."

¶ 27    The State sought dismissal, arguing that the potential evidence collected from the shell casing would fail to advance Martinez's claim of actual innocence significantly. At best, the State argued, "the result of latent print and/or DNA testing would only show who may have touched the casing at some time but would not indicate who possessed the firearm and was the shooter in this case."

¶ 28    At the argument on the motion, the State contended that no result of fingerprint or DNA testing would be materially relevant because the presence of someone else's fingerprint or DNA on the shell casing "would only go to that person having touched that cartridge casing at some point. That does not mean that it is the same person that loaded a firearm, had possession of a firearm, and shot into the victim's home, striking the victim."

¶ 29    Martinez insisted that identity was at issue, and rebutted the State's relevance challenge. He argued that "[none of the witnesses] actually said that they saw him pull a trigger or shoot anyone," so it was "extremely relevant to analyze the forensic evidence on the case because if it comes up as somebody else's latent fingerprint, then you have another culprit and an alternate suspect in this case."

¶ 30    The trial court denied Martinez's motion for forensic testing. According to the court, no further testing could have any bearing on its findings, and that Martinez's conviction had been affirmed on direct appeal. The court recounted that witnesses identified Martinez as the individual who confronted Sergio. And it restated that Martinez had a motive and that witnesses identified him as the driver of the white Intrepid, which had fled police and led to a high-speed chase. The court reasoned that even if someone else's DNA was on a shell casing, "it wouldn't eliminate all of the evidence that [Martinez] committed these crimes and the evidence that caused him to be convicted beyond a reasonable doubt," and it would not support that another person was the shooter.

¶ 31                                  Analysis

¶ 32                          *Section 116-3 Prerequisites*

¶ 33    Martinez appeals, arguing that he met the criteria for DNA testing undersection 116-3.

¶ 34    Section 116-3 sets the prerequisites that a defendant must satisfy to establish entitlement to postconviction forensic testing. *People v. Smith*, 2014 IL App (1st) 113265, ¶ 19. A defendant can file a motion before the trial court that entered judgment for "fingerprint, Integrated Ballistic Identification System, or forensic DNA testing" on evidence "secured in relation to the trial or guilty plea which resulted in his conviction." 725 ILCS 5/116-3(a), (b) (West 2020).The statute permits this testing if the evidence has not been previously subjected to the requested testing and if the defendant presents a *prima facie* case demonstrating that: "(1) identity was the issue in the trial \*\*\* which resulted in his or her conviction"; and (2) "the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." *Id.*

¶ 35    When the defendant establishes a *prima facie* case, the circuit court must grant the requested testing on a determination that: (1) "the result of the testing has the scientific potential to produce new, noncumulative evidence" that is "materially relevant to the defendant's assertion of actual innocence when the defendant's conviction was the result of a trial, even though the results may not completely exonerate the defendant" and (2) the requested testing "employs a scientific method generally accepted within the relevant scientific community." See 725 ILCS 5/116-3(c) (West 2020). We conduct a *de novo* review of the denial of a section 116-3 motion. *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21.

¶ 36    The State concedes that identity was an issue at trial and doesn't contest that the requested DNA and fingerprint testing would employ an acceptable scientific method. But, the State argues that: (i) Martinez failed to establish an adequate chain of custody for the shell casing and (ii) the testing would not yield materially relevant evidence regarding his actual innocence claim.

¶ 37    We need not determine whether Martinez established a sufficient chain of custody for the shell casing because, even assuming that he did, he cannot show that the results would have the scientific potential to produce new, noncumulative evidence that is materially relevant to his assertion of actual innocence.

¶ 38                            *Material Relevance of Potential Findings*

¶ 39    Martinez asserts that because of the paucity of forensic findings at trial, and that no witness directly identified him as the shooter, only the driver of the white Intrepid, the fingerprint and DNA testing could potentially identify another individual who fired a 9mm caliber bullet on the day of the shooting. According to Martinez, these new forensic results would provide fresh, noncumulative evidence that is materially relevant to his assertion of actual innocence.

¶ 40    Materially relevant evidence does not need to exonerate the defendant completely; instead, it must "significantly advance" a claim of actual innocence. *People v. Johnson*, 205 Ill. 2d 381, 395 (2002) (collecting cases). A motion for forensic testing should be granted if the testing holds " even a slight possibility for a favorable result." *People v. Morrow*, 2022 IL App (1st) 200388,¶ 61. Yet, "evidence that plays a minor role and is a collateral issue is not materially relevant because it does not significantly advance a claim of actual innocence." *People v. Gecht*, 386 Ill. App. 3d 578, 582 (2008) (citing *People v. Savory*, 197 Ill. 2d 203, 213 (2001)). In determining materially, we evaluate both the trial evidence and the evidence the defendant seeks to test. *Savory*, 197 Ill. 2d at 214.

¶ 41    After reviewing the record, we conclude that the circuit court correctly denied Martinez's motion, given the overwhelming evidence of his guilt. DNA and fingerprint testing of a shell

casing retrieved from the scene would not yield evidence "materially relevant" to Martinez's claim of innocence.

¶ 42    Martinez emphasizes that no trial witness saw him handling a firearm, and the evidence linking him to the shooting was circumstantial. Specifically, it showed Martinez, driving his white Intrepid when he followed Sergio and threatened him in the alley behind the Enriquez residence by stating that he "was marked." Shortly afterwards, Meriam Enriquez was shot by a firearm protruding from the driver's side window of a white Intrepid. Sergio saw the white Intrepid in front of his house and heard the gunshots. Sergio then saw the Intrepid continue northbound, while Curtis saw it further north on the same street. Gonzales also saw the Intrepid on the next block and identified Martinez as the driver.

¶ 43    Affirmed.