2023 IL App (1st) 211489-U

Nos. 1-21-1489 and 1-22-0446 cons.

Order filed December 22, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 19800 |
| | ) | |
| TERRENCE GALLOWAY, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Johnson and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In this consolidated appeal, we reverse the denial of defendant's *pro se* motion for fingerprint testing and vacate the denial of leave to file a third successive postconviction petition so that defendant may supplement his successive petition with the results of the fingerprint testing.

¶ 2    Few claims deserve more careful and thoughtful examination than a postconviction claim of actual innocence. Few claims have a more fundamental role in upholding the integrity of the legal process than a claim of actual innocence. And few claims have a more overarching

responsibility of rectifying miscarriages of justice than a claim of actual innocence. Defendant, Terrence Galloway has always insisted on his innocence. Our decision allows him to obtain the evidence that may establish his claim.

¶ 3    Following a jury trial, Galloway was found guilty of first degree murder and attempted murder, and sentenced to a total of 81 years in prison. We affirmed on direct appeal. Galloway filed several unsuccessful collateral attacks on his convictions. In 2021, Galloway filed, *pro se*, a motion seeking fingerprint testing under section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2020)), and a motion for leave to file a third successive *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2020)). The circuit court denied Galloway relief in both proceedings, and Galloway appealed. We consolidated the appeals for disposition.

¶ 4    In appeal number 1-21-1489, the denial of the section 116-3 motion for fingerprint testing, we reverse and remand so the circuit court may order fingerprint testing of the relevant evidence, finding that Galloway has met the requirements of section 116-3. In appeal number 1-22-0446, the denial of leave to file a third successive postconviction petition, we vacate the denial of leave to file and remand so Galloway may supplement that filing with the results of the fingerprint testing.

Background

¶ 5    The facts have been detailed in our prior orders. We relate only facts necessary to decide this appeal. Galloway was charged with multiple offenses, including the first degree murder of Stacy Adams, the attempted first degree murder of David Etheridge, and the aggravated battery of Etheridge arising from a shooting in Chicago on October 9, 2009. The matter proceeded to a jury trial.

¶ 6      Randall Knox testified that he had been convicted of the delivery of a controlled substance and sentenced to 24 months of probation, which he had completed. Between 8 p.m. and 8:30 p.m. on October 9, 2009, he, Adams, and Etheridge were on the 700 block of North Harding Street in Chicago. Adams and Etheridge left to purchase alcohol, then returned. At one point, two men wearing hooded sweatshirts approached. Knox knew one man as "Q" but did not recognize the second man then. Knox identified Galloway in court as the second man. Galloway approached Etheridge, said, "what's up," and drew a firearm with his right hand. On seeing the firearm, Knox ran and, as he did, heard three gunshots. Later, while in a nearby parking lot, Knox saw police officers chasing Galloway but could not see whether Galloway held a firearm.

¶ 7      On November 12, 2009, Knox was arrested and brought to a police station. There he related what he saw on October 9, 2009, and identified photographs of Q and Galloway.

¶ 8      During cross-examination, Knox acknowledged that it was dark but asserted the streetlights were on, and he saw Galloway's face, although Galloway wore a hood. The shooting occurred behind Knox as he ran. He denied seeing a man get out of a red van and discharge a firearm or seeing Etheridge shot at another location. Knox did not contact the police.

¶ 9      Xavier Miller, who acknowledged four prior narcotics convictions and one prior firearm conviction, testified that around 8 p.m., he was at a third floor window smoking when he heard loud voices at the north end of the block. He heard three gunshots and saw two people run north, one person run south, and another person fall to the ground. Miller could not see faces or anyone with a firearm. He went outside and saw Galloway, whom he identified in court, running through a vacant lot. Galloway had on a black hooded sweatshirt and held a black object in his right hand.

Miller went to Adams, on the ground bleeding from the head. The next day, Miller's mother took him to a police station, where he spoke to police and identified Galloway in a lineup.

¶ 10     During cross-examination, Miller agreed that it was dark at the time of the shooting, and he could not see the shooter's face but saw the muzzle flash and people running.

¶ 11     Etheridge, who acknowledged a conviction for aggravated battery to a police officer and a pending case for driving under the influence of alcohol, testified that he was with Adams and Knox on the sidewalk when Q and another man whom Etheridge did not know approached. Etheridge identified Galloway in court as the second man. Galloway's hands were in his hooded sweatshirt pocket. Galloway stopped about three feet away and said, "what's up." Etheridge replied, "N***, what's up." Galloway drew a firearm with his right hand; there was a flash, and Etheridge ran. As he ran, he felt pain in his shoulder and heard a "couple" more gunshots.

¶ 12     Etheridge returned home, and an ambulance took him to a hospital. Etheridge told the paramedics that a "guy" who jumped out of a "red van" shot him near Ridgeway Avenue and Chicago Avenue. He lied because he was scared and did not want anyone to know where he was shot. When he told this story to a police officer at a hospital, the officer responded that shooting occurred on Harding and Adams was killed; Etheridge then admitted where he was shot. Following treatment, police took Etheridge to a police station. He viewed a lineup and identified the person who shot him. Galloway was the only person he saw with a firearm.

¶ 13     During cross-examination, Etheridge acknowledged that at the time of the shooting, he was on parole. He was shot and ran but told the grand jury that he ran and then heard gunshots. Etheridge also testified that he did not see what happened.

¶ 14    Chicago police officer Thomas O'Brien testified that shortly after 8:30 p.m., he and his partner, Officer Kevin Stanula, drove toward an area after hearing gunshots. At one point, Stanula got out and chased two men in hooded sweatshirts. O'Brien, who continued to go, saw a person exit an alley, wearing a black hooded sweatshirt with his hands in his pockets. O'Brien identified Galloway in court as this person. Galloway entered the driver's side of a minivan, so O'Brien parked his squad car to block it and ordered Galloway out. Instead, Galloway fled. As Galloway ran, he used his right hand to hold onto his right waistband. Stanula took over the pursuit, and Galloway was arrested. O'Brien never saw Galloway in a red van or holding a firearm.

¶ 15    Stanula testified that he initially chased two men on foot but responded to O'Brien's request for help and saw a person matching the description O'Brien provided. He identified Galloway in court as this person. Stanula pursued Galloway and saw him remove something from his waistband, which he believed was a firearm. Using his right hand, Galloway threw the object over a fence. Galloway was eventually arrested. Stanula returned to where he saw Galloway toss the object, looked through a fence, and observed a black revolver. Stanula identified a photograph of the firearm, a .38-caliber revolver.

¶ 16    Additional evidence established that at a police station, Galloway's hooded sweatshirt was removed, he was handcuffed, and his hands tested for gunshot residue (GSR). A GSR test was also performed on his hooded sweatshirt. Forensic scientist Ellen Chapman testified that her analysis of Galloway's GSR test revealed that he "may not have discharged a firearm with either hand." If he did discharge a firearm, "the particles were removed by activity, were not deposited, or were not detected by this [test]." Tests on the right cuff of the hooded sweatshirt were positive for GSR

particles, and the left cuff tested positive for "background samples." Chapman concluded that the right cuff had contact with a GSR-related item or was in the environment of a discharged firearm.

¶ 17    During cross-examination, Chapman agreed that the GSR tests of Galloway's hands and the left cuff were negative, and GSR can be transferred through handshakes or the application of handcuffs. During redirect, Chapman acknowledged that she could not determine whether Galloway discharged a firearm but could only determine whether GSR particles existed.

¶ 18    The State presented stipulations establishing that a buccal swab was taken from Galloway and submitted for processing and that DNA swabs from the firearm were preserved for analysis. The State gave a further stipulation that two bullets and one bullet fragment were recovered from Adams' body. Retired Chicago police officer Donald Fanelli testified that he was previously a forensic investigator and investigated this shooting. He found no firearm evidence at the scene. Fanelli relocated to another area, where he found a steel revolver on the ground inside a fenced-in location. The firearm was recovered and taken to a crime lab. Fanelli swabbed the firearm for DNA, put it in a firearm evidence box, and sealed it. The box was sent to the Illinois State Police Crime Lab for processing along with the three live rounds and three cartridge cases removed from the firearm. Fanelli identified the firearm at trial. (The record does not indicate how Fanelli handled the firearm at trial or whether he wore gloves. The record does suggest that he removed the firearm from a bag.)

¶ 19    Fanelli explained that he generally swabbed areas on a firearm that were not "finger-printable," such as the grip. This firearm had electrical tape on the grip; he swabbed a small "serrated area" that would not hold a fingerprint. He also swabbed the hammer and cylinder release, serrated areas from which a fingerprint could not be taken.

¶ 20    During cross-examination, Fanelli explained that he took DNA swabs from places where one would not expect fingerprints to appear to preserve possible fingerprints. Firearms are sent to the Illinois Police Crime Lab for fingerprint processing.

¶ 21    Illinois state police forensic scientist Marc Pomerance testified that the firearm was functional. He performed specific tests that indicated the fired cartridges, bullets, and bullet fragments recovered from Adams's body had been discharged by the firearm. He did not test the firearm or the bullets for fingerprints because he did not "do fingerprints."

¶ 22    Illinois state police forensic scientist Lisa Kell testified that she received swabs from a firearm and a buccal standard from Galloway. Her analysis revealed that DNA obtained from the firearm contained a mixture of DNA from at least two people, and Galloway could not be excluded from having contributed to the mixture. Moreover, one in four African-Americans, one in eight whites, and one in six Hispanic unrelated individuals could not be excluded from having contributed to the DNA profiles identified on the firearm.

¶ 23    After closing arguments, the jury deliberated. The firearm was one of the exhibits sent to the jury room. The jury found Galloway guilty of the first degree murder of Adams, during which he discharged a firearm, the attempted first degree murder of Etheridge, during which he discharged a firearm that proximately caused great bodily harm, and aggravated battery with a firearm of Etheridge. At sentencing, the trial court merged certain counts and imposed a 50-year sentence for one count of first degree murder and a consecutive 31-year sentence for one count of attempted murder. We affirmed on direct appeal. See *People v. Galloway*, 2014 IL App 1st 122942-U.

¶ 24    Galloway filed several unsuccessful collateral appeals. See *People v. Galloway*, No. 1-15-3142 (2017) (unpublished summary order under Illinois Supreme Court Rule 23(c)) (affirming dismissal of Galloway's *pro se* postconviction petition); *People v. Galloway*, 2019 IL App (1st) 161592-UB (affirming denial of leave to file a successive postconviction petition as Galloway did not establish a claim of actual innocence); *People v. Galloway*, No. 1-17-0253 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)) (affirming denial of leave to file a second successive postconviction petition).

### Appeal Number 1-21-1489

¶ 25    On April 13, 2021, Galloway filed a *pro se* section 116-3 motion seeking fingerprint testing on the firearm. See 725 ILCS 5/116-3 (West 2020). The motion alleged that Galloway was tied to the firearm solely by eyewitness testimony and fingerprint testing, combined with testimony from witnesses discovered after trial, would establish his innocence. The motion further alleged that although the firearm had not been subjected to fingerprint testing, steps were taken to preserve possible fingerprints, the evidence to be tested was subject to a sufficient chain of custody to establish that it had not been substituted, tampered with, replaced, or altered in any material aspect, and identity was contested at trial.

¶ 26    Attached in support were portions of the trial transcript, lab reports relating to DNA and firearm analysis authored by Kell and Pomerance, respectively, and the affidavits of Matthew Brown-Turner and Anthony Ward.

¶ 27    In his affidavit, Brown-Turner averred that around 8:30 p.m. on October 9, 2009, he saw his cousin, Bernard Hopkin, walking behind Anthony Ward, who was followed by a man Brown-Turner later discovered was Etheridge. Etheridge shouted and drew a firearm, pointed it at Hopkin,

and Hopkin reached for the firearm, which discharged. At this point, Brown-Turner saw Adams fall to the ground. Hopkin and Etheridge struggled over the firearm, which discharged a second time, causing Etheridge to scream and flee. Hopkin walked toward Brown-Turner, fired at Adams again, and dropped the firearm. Brown-Turner described the firearm as having black tape.

¶ 28    Brown-Turner did not previously come forward because he did not want to be outcast from his family and feared retaliation from the neighborhood. He left for Atlanta "shortly" after the shooting and did not know that Galloway had been arrested. But, in 2014, he learned from his cellmate at the Cook County jail that Galloway was convicted of offenses in which Galloway had "no involvement" and were committed by Brown-Turner's cousin. Brown-Tuner finally averred that Galloway was "not present before, during, or after the shooting."

¶ 29    In his 2015 affidavit, Ward averred that on October 9, 2009, he was shooting dice with Hopkin and others when Etheridge and several people approached. Etheridge asked Hopkin, "what's up," and Hopkin replied, "get on somewhere." Etheridge punched Hopkin in the face, and the two men fought. When the fight ended, Hopkin told Ward to "come on." Etheridge drew a firearm. Hopkin reached for the firearm, and the men wrestled until the firearm discharged, and Ward ran. Ward heard two more gunshots. Ward did not previously come forward because he did not know that anyone was killed or arrested, feared the consequences, and did not know Galloway, who was not present. (This appears to be the same affidavit Galloway attached to a prior successive postconviction petition. See *Galloway*, 2019 IL App (1st) 161592-UB, ¶¶ 4-25.)

¶ 30    On May 21, 2021, the circuit court denied the motion in a written order, noting that the evidence was already tested, and Galloway had not demonstrated that it could be subjected to additional testing using a method that was not scientifically available at the time of trial and which

would provide a reasonable likelihood of more probative results. The court further found that the testimony at trial established that Galloway could not be excluded from the DNA identified on the firearm and that police officers observed Galloway flee and dispose of the firearm used in the shooting. The court concluded that testing would be immaterial because the DNA analysis corroborated eyewitness testimony. The court also announced its ruling from the bench. (The transcript bears the date of January 21, 2021, but that cannot be correct as the motion was not filed until April 2021.) Galloway did not file a motion to reconsider.

¶ 31    On appeal, Galloway contends that the circuit court erred in denying the motion for fingerprint testing filed under section 116-3 of the Code because the firearm has not been previously tested, identity was a "central" issue at trial, the chain of custody of the firearm was maintained, and the requested testing had the potential to produce new, noncumulative evidence relevant to his claim of actual innocence. Galloway argues that favorable results from fingerprint testing could identify another possessor of the firearm and support the version of events related in the affidavits of Brown-Turner and Ward. He concludes that if his fingerprints are not recovered from the firearm, it would "negate" the theory that he discharged it.

¶ 32    Section 116-3 authorizes a defendant to file a motion in the circuit court "for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing, *** on evidence that was secured in relation to the trial or guilty plea which resulted in his or her conviction" if the evidence was not previously subjected to the requested testing and the defendant presents a *prima facie* case that:

> "(1) identity was the issue in the trial or guilty plea which resulted in his or her
>
> conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(a), (b) (West 2020).

¶ 33 Identity is at issue if the identity of the offender is disputed or in question. *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21. Additionally, a defendant may rely on presumptions and conclusory assertions regarding the chain of custody "because the evidence sought to be tested will almost surely have been within the State's safekeeping rather than the defendant's." *Id.*

¶ 34 If the defendant presents a *prima facie* case, the circuit court shall allow the requested testing on a determination: (1) "the result of the testing has the scientific potential to produce new, noncumulative evidence" that is "materially relevant to the defendant's assertion of actual innocence when the defendant's conviction was the result of a trial, even though the results may not completely exonerate the defendant"; and (2) the requested testing "employs a scientific method generally accepted within the relevant scientific community." See 725 ILCS 5/116-3(c) (West 2020).

¶ 35 The well-pleaded facts in a section 116-3 motion are accepted as true and construed liberally unless contradicted by the record. *Cocroft*, 2020 IL App (1st) 180056, ¶ 21. We review the denial of a section 116-3 motion *de novo*. *Id.*

¶ 36 The parties disagree on whether the firearm was previously tested for fingerprints. Although Galloway alleges that the firearm was not previously subject to fingerprint testing, the State asserts that the record is "unclear" whether the firearm was tested. The State notes that at trial Fanelli and Pomerance denied conducting fingerprint testing, indicating that fingerprint testing was the purview of a different department. The State concludes that because "there is no

evidence in the record" as to whether the firearm was subjected to fingerprint testing, Galloway cannot establish that it was not tested.

¶ 37    We accept as true the allegation that the firearm was not subject to fingerprint testing at the time of trial unless contradicted by the record. See *Id.* As the State concedes that nothing in the record indicates whether the firearm was subjected to fingerprint testing, the record does not contradict Galloway's assertion. We must accept this allegation as true. *Id.* Thus, Galloway has met the requirement of section 116-3(a)(1) of the Code. 725 ILCS 5/116-3(a)(1) (West 2020).

¶ 38    As there is no evidence that the firearm was subject to fingerprint testing, section 116-3(a)(2), addressing tested evidence that could be subjected to additional testing that was not scientifically available at the time of trial, does not apply. See 725 ILCS 5/116-3(a)(2) (West 2020); see also *People v. Smith*, 2014 IL App (1st) 113265, ¶ 20 (under amended statute, defendant need only establish that evidence to be tested was not subject at trial to testing requested under section 116-3).

¶ 39    Next, Galloway asserts, and the State concedes, that identity was an issue at trial. We agree. At trial, Galloway asserted his innocence, and defense counsel cross-examined each witness. See *People v. Shum*, 207 Ill. 2d 47, 66 (2003) (identity was central issue at trial, despite eyewitness identification, when defendant "consistently denied involvement in the crimes"). Accordingly, Galloway has made a *prima facie* showing that identity was an issue at trial. See 725 ILCS 5/116-3(b)(1) (West 2020).

¶ 40    Galloway also asserts that he has made a *prima facia* case that the firearm was "subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect" (see 725 ILCS 5/116-3(b)(2) (West 2020)), when it was admitted

at trial and presumably retained by the clerk of the circuit court. We agree. Our supreme court has held that a defendant is excused from establishing a chain of custody for evidence that was admitted at trial since, presumably, the admitted evidence would have remained within the custody of the circuit court clerk. *People v. Johnson*, 205 Ill. 2d 381, 393-94 (2002).

¶ 41    The State, however, argues that because the record does not indicate that "any measure of care was taken" to preserve potential fingerprints or the parties handling the firearm at trial wore gloves, potential fingerprints on the firearm were "materially altered." The State relies on *People v. Lewis*, 2019 IL App (1st) 160705, where, after the defendant's first trial was declared a mistrial due to a hung jury, the defendant's trial counsel, before the second trial, moved the trial court to permit fingerprint testing on a firearm. *Id.* ¶ 3. The court denied the motion, stating that the handling of the firearm during the first trial "obliterated" fingerprints and " 'the time to test this weapon for prints has come and gone.' " *Id.* The matter proceeded to a jury trial, and the defendant was ultimately found guilty of aggravated unlawful use of a weapon. *Id.* ¶¶ 1, 20.

¶ 42    On appeal, the defendant alleged, relevant here, that the trial court abused its discretion when it did not allow trial counsel to have the firearm tested for fingerprints. *Id.* ¶ 41. The panel determined that the trial court did not abuse its discretion in finding that how the firearm was handled at the defendant's first trial "likely obliterated" fingerprints; therefore, fingerprint testing would not have "any evidentiary value." *Id.* ¶¶ 43-44. Further, the defendant did not dispute the trial court's factual finding regarding how the firearm was handled and conceded that the trial court permitted trial counsel to argue that the firearm was never tested for fingerprints. *Id.* ¶ 44.

¶ 43    Unlike *Lewis*, we are not reviewing a trial court's evidentiary ruling for an abuse of discretion. Instead, the question is whether Galloway has made a *prima facie* case that the firearm

was "subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." See 725 ILCS 5/116-3(b)(2) (West 2020); see also *People v. LaPointe*, 2018 IL App (2d) 160432, ¶ 41 (rejecting State's argument that remand was warranted to establish a "proper" chain of custody when evidence, due its age, might not be in condition to permit meaningful testing, as this possibility did not affect "whether, under the applicable case law, [the] defendant's motion made a *prima facie* case that the evidence was subject to a proper chain of custody"). The firearm was admitted at trial and presumably remains in the custody of the circuit court clerk. Thus, Galloway satisfied the chain of custody requirement.

¶ 44    Finally, section 116-3(c) states that the trial court shall allow the requested testing, provided that it determines that (i) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the result might not completely exonerate defendant, and (ii) the requested testing is generally accepted in the scientific community. 725 ILCS 5/116-3(c) (West 2020).

¶ 45    The parties do not dispute that fingerprint testing is generally accepted in the scientific community. We determine whether the requested testing has the potential to produce new, non-cumulative evidence materially relevant to Galloway's claim of actual innocence.

¶ 46    "Evidence which is materially relevant to a claim of actual innocence is evidence which tends to significantly advance that claim, and, pursuant to the express terms of the statute, need not completely exonerate a defendant." *People v. Smith*, 2014 IL App (1st) 113265, ¶ 24. In determining whether testing would reveal materially relevant evidence, we consider the evidence presented at trial and assess the evidence the defendant seeks to acquire through testing. *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 11. But, the strength of the State's evidence is not a hurdle a

defendant must overcome to meet the statute's requirements. *Id.* (citing *People v. Barrow*, 2011 IL App (3d) 100086, ¶ 27).

¶ 47 Our supreme court has held that testing under section 116-3 "is not limited to situations in which scientific testing of a certain piece of evidence would completely exonerate a defendant." *People v. Savory*, 197 Ill. 2d 203, 214 (2001); see also *People v. Price*, 345 Ill. App. 3d 129, 134 (2003) (quoting *Anderson v. State*, 831 A.2d 858, 867 (Del. 2003) (motion for forensic testing should be granted when requested testing presents even " 'slight' " possibility of favorable result). The testing must " 'significantly advance' " the defendant's claim of actual innocence. *People v. Stoecker*, 2014 IL 115756, ¶ 33 (quoting *Savory*, 197 Ill. 2d at 213). Whether this standard has been satisfied depends on evaluating the evidence presented at trial. *Id.*

¶ 48 Galloway acknowledges that the results of the fingerprint testing, in and of themselves, will not exonerate him but asserts that identifying other possessors of the firearm is materially relevant to his actual innocence claim by lending further support to the events described by Brown-Turner and Ward, that is, that Etheridge drew the firearm and Galloway was not present. Galloway also notes that the three witnesses who placed him at the shooting were convicted felons and posits that Knox and Etheridge, who did not approach police of their own volition, were potential suspects with motive to lie to escape responsibility.

¶ 49 This court's review of the trial evidence reveals that Knox placed Galloway at the scene before the shooting holding a firearm, Etheridge identified Galloway as the only person holding a firearm, and Miller saw Galloway running while holding a black object immediately after the shooting. Stanula testified that Galloway threw an object over a fence, and that object was later determined to be the firearm used in this offense. While Galloway's hooded sweatshirt tested

positive for GSR, his hands were negative. Moreover, although Galloway could not be excluded as having contributed to the DNA mixture recovered from the firearm, neither could one in four African-Americans, one in eight whites, and one in six Hispanic unrelated individuals, and that mixture was comprised of the DNA of at least two people. Moreover, Galloway has made no inculpatory statements and continuously asserted his innocence.

¶ 50    Instructive is *People v. Smith*, 2014 IL App (1st) 113265. The defendant filed a motion under section 116-3 seeking DNA testing on two pieces of clothing presented at trial. *Id.* ¶¶ 1, 17. The circuit court denied the motion, finding that DNA testing would not reveal evidence materially relevant to a claim of actual innocence in light of the eyewitness trial testimony. *Id.* ¶ 17. On appeal, the State conceded, and we agreed, that the evidence at issue had not previously been subjected to DNA testing, the items were subject to a proper chain of custody, and identity was an issue at trial. *Id.* ¶¶ 20-23. Thus, the determinative issue was whether the defendant showed that the requested testing was materially relevant to his claim of actual innocence.

¶ 51    We noted that one witness identified the defendant as the shooter, and another witness identified him as, shortly after the shooting, leaving the scene in a van. *Id.* ¶ 25. Additional evidence established that the shooter had on a gray sweatshirt and that 90 minutes after the shooting, the defendant was discovered sitting on a gray sweatshirt in a van, matching the description of the van at the scene and from which the firearm used in the offense was thrown. *Id.* Although gloves were recovered from the sweatshirt's pouch, no forensic evidence linked the defendant to the offense. *Id.* Neither the gloves nor the sweatshirt had undergone forensic testing, no suitable fingerprints were available for analysis, and the defendant's GSR test results fell within normal limits. *Id.* Additionally, the defendant did not make inculpatory statements, denied

involvement in the shooting and ownership of the sweatshirt, and testified at trial that he saw another person throw the "murder weapon" from the van's passenger window. *Id.* ¶¶ 25-26. Evidence at trial established that this person borrowed the van, and his GSR test results were inconclusive. *Id.* ¶ 26.

¶ 52    On appeal, the defendant asserted that if DNA testing of the clothing did not show his DNA but did show the other person's DNA, it would support the defense theory that this person was the shooter and advance the defendant's claim of actual innocence.

¶ 53    We agreed with the defendant, rejecting the State's argument that the testing results would show that someone else touched the clothing, which would not overcome the credible witness identifications at trial and would, thus, not be materially relevant to the defendant's claim of actual innocence. *Id.* ¶ 27. To the contrary, we found that because the sweatshirt and gloves were a "central focus" at trial and on appeal, a favorable result from a DNA test of those items could "significantly" advance an actual innocence claim when the defendant never made incriminating statements. *Id.* ¶ 30. The State repeatedly referenced the sweatshirt at trial. *Id.*

¶ 54    Similarly, Galloway has not made inculpatory statements and has consistently asserted his innocence. The evidence to be tested, the firearm, was used in the offense. At trial, Stanula testified that Galloway tossed an item over a fence, later determined to be the firearm used in the offense. A favorable result from a fingerprint test could advance Galloway's claim of actual innocence and further support the version of events related by Ward and Brown-Turner.

¶ 55    We are unpersuaded by the State's reliance on *People v. Navarro*, 2015 IL App (1st) 131550. There, the defendant was convicted of first degree murder based on the testimony of eyewitnesses who saw the defendant firing in the direction of the victim and holding a firearm

while being chased by police. *Id.* ¶¶ 3-5. Forensic evidence established that "spent shells" from the scene were fired from the firearm recovered by police officers during the chase. *Id*. The defendant later filed a motion seeking ballistics testing, arguing "that the murder weapon might have been used by one of a 'group of young thugs' allegedly seen in the neighborhood before the shooting." *Id*. ¶ 7.

¶ 56      On appeal, the parties did not dispute that identity as the issue and a *prima facie* chain of custody having been established but disputed whether ballistics testing through the Integrated Ballistic Identification System (IBIS) (a national computer database for firearms, bullets, and cartridge casings) had the potential to produce new, noncumulative evidence materially relevant to the defendant's claim of actual innocence. *Id*. ¶ 15.

¶ 57      We affirmed the denial of testing because the "ballistics evidence was not the lynchpin of the State's case." *Id*. ¶ 18. Although the defendant requested IBIS testing of the shells recovered at the scene in an attempt to find evidence linking them to a different firearm and establish that the firearm recovered was not the murder weapon, his argument discounted the four witnesses who identified him as the shooter and that the ballistics testimony "corroborated" that testimony by linking the shells at the scene to the recovered firearm. *Id*. ¶ 16.

¶ 58      Unlike *Navarro*, Galloway supports his request for testing under section 116-3 of the Code with affidavits from witnesses who aver that he was not present and that other individuals, including one of the victims in this case, were involved in the shooting. Thus, favorable results from fingerprint testing could materially advance Galloway's claim of actual innocence.

¶ 59      In making this determination, we recognize that the State's argument that we previously "discredited" the sequence of events related by Ward and Brown-Turner when we denied

Galloway leave to file a successive *pro se* postconviction raising a claim of actual innocence based, in relevant part, on Ward's affidavit. See *Galloway*, 2019 IL App (1st) 161592-UB.

¶ 60    While we find in this appeal that Galloway has met the requirements of section 116-3 of the Code to establish that the requested testing has the potential to reveal evidence materially relevant to his claim of actual innocence, we make no prediction on the ultimate success of the claim. To establish a claim of actual innocence in a successive postconviction petition, the supporting evidence must be newly discovered, material, not cumulative, and of a conclusive character that would probably change the result at a retrial. See *People v. Robinson*, 2020 IL 123849, ¶ 47. While Galloway's actual innocence claim could potentially be bolstered by favorable fingerprint testing results, whether the claim would be bolstered enough to meet that standard is not before us.

¶ 61    Accordingly, we find that the fingerprint testing of the firearm requested by Galloway is materially relevant to his claim of actual innocence. We reverse the circuit court's order denying Galloway's section 116-3 motion and remand this case so that the circuit court may promptly order fingerprint testing of the firearm.

Appeal Number 1-22-0446

¶ 62    On March 2, 2021, Galloway filed a *pro se* petition for leave to file a third successive postconviction petition alleging a claim of actual innocence based on the newly discovered affidavit of Brown-Turner, who stated that Galloway was not present at the shooting. The Brown-Turner affidavit also was attached to the section 116-3 motion. In an affidavit, Galloway stated that in June 2019, Brown-Turner approached him in the Menard Correctional Center inmate

kitchen, related what he knew about the shooting, and agreed to provide an affidavit. Galloway further stated that he was innocent and Etheridge "set" him up by falsely identifying him.

¶ 63    On April 13, 2021, the circuit court denied Galloway leave to file the petition.

¶ 64    Due to this court's disposition in appeal number 1-21-1489, we vacate the circuit court's denial of leave to file the third successive postconviction petition and remand the cause to the circuit court so that Galloway may supplement his filing with the results of the fingerprint testing should he so desire, allowing Galloway the opportunity to present all evidence of his actual innocence claim in the same proceeding.

Conclusion

¶ 65    In appeal number 1-21-1489, we reverse the circuit court's order denying Galloway's section 116-3 motion and remand the cause so that the circuit court may promptly order fingerprint testing of the firearm.

¶ 66    In appeal number 1-22-0446, we vacate the circuit court's denial of leave to file a third successive postconviction petition and remand the cause to the circuit court so that Galloway may supplement his filing with the results of the fingerprint testing.

¶ 67    Reversed and remanded with directions.