# Illinois Official Reports

## Appellate Court

---

### *People v. Smith*, 2014 IL App (1st) 113265

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LESHUN SMITH, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-3265 |
| Filed | March 27, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's denial of defendant's request for DNA testing of a sweatshirt and gloves discovered at the time of his arrest for first degree murder was reversed and the cause was remanded to allow the trial court to order such testing, since the sweatshirt and gloves were a central focus at defendant's trial, and in his appeal, the record showed defendant made no inculpatory statements, the State's case was largely circumstantial, and the requested testing is materially relevant to defendant's claim of actual innocence, especially if defendant's DNA is absent or another person's DNA is present. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-26852; the Hon. Maura Slattery-Boyle, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Megan E. Ledbetter, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Amy M. Watroba, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Howse and Justice Epstein concurred in the judgment and opinion.


**OPINION**

¶ 1     Defendant, Leshun Smith, appeals from an order of the circuit court of Cook County denying his motion for deoxyribonucleic acid (DNA) testing under section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2010)). He contends that the trial court erred in denying his motion because the testing requested has the potential to produce noncumulative evidence materially relevant to his claim of actual innocence. He thus requests that we reverse the trial court's order and remand his cause with instructions that the court order DNA testing on two items of clothing that were presented at trial.

¶ 2     The record shows that defendant's 2001 conviction of first degree murder arose from events that transpired on October 28, 1999, near 1821 West 56th Street in Chicago, Illinois. On that date, Melvin Owens was fatally shot by a man wearing a gray sweatshirt, and, later that same day, police found defendant sitting on a gray sweatshirt in a van matching the description of the getaway vehicle and from which the murder weapon was thrown.

¶ 3     At trial, Sheila Smith[1] testified that about 1 p.m. on the day of the incident she was outside her apartment building at 1839 West 56th Street, unloading groceries from her car, when her friend Owens approached her. After a brief conversation, Owens walked to a store about 100 feet from her building. Shortly thereafter, she saw a man wearing a gray "hoody" approach the entrance to her building, and although the hood was over his head, she was able to see his face from a distance of about five feet when he turned to peer inside. Sheila identified defendant in court as that man and further testified that she continued to watch as defendant walked away and "duck[ed]" behind a nearby garage. Soon thereafter, she saw defendant emerge from that garage when Owens exited the store and began walking in her direction. She yelled "watch out," then saw defendant shoot Owens numerous times before running toward Wolcott Street. Although she could not see defendant's face at that time, the shooting occurred a block away from her and nothing was obstructing her view. The following day, she viewed a lineup at the police station and identified defendant as the shooter. She also identified a picture of a hoody as the one she saw defendant wearing the previous day.

¶ 4     Jean Turner testified that about 1 p.m. on the day of the incident, she was sitting on her porch at 5527 South Wolcott Street and saw a van park in front of her home. Shortly thereafter, she heard several gunshots, followed by a "click," and saw that the rear passenger side door of the van was now slightly ajar. She then saw a man running north on Wolcott in her direction. His hands were inside the pockets of the gray sweatshirt he was wearing, and he became briefly tangled in a wire fence in her yard as he entered the van. At that time, she was able to see his face from a distance of about six feet, and, because his hood was approximately an inch away from his forehead, she was also able to see the color of his hair. Turner identified defendant in court as that man and further testified that after the van sped away, she wrote down the license

_____

[1]Sheila Smith and defendant are not related.

plate number of the van and gave it to police, along with a description of defendant. Later that day, she viewed a lineup at the police station and identified defendant as the man she had seen running down the street and jumping into a van shortly after she heard gunshots. Police also showed her a picture of a sweatshirt, and she identified it as the one worn by defendant.

¶ 5 Lola Smith, Sheila's mother, testified that about 1 p.m. on the day of the incident, she was helping Sheila with groceries when Owens approached them and spoke briefly before walking to a nearby store. Shortly thereafter, she saw a man wearing a gray hooded sweatshirt peer into Sheila's apartment building, then walk away. She did not pay particular attention to him after that, but Sheila continued to watch him. A short while later, she heard a gunshot and saw Owens fall to the ground, then saw the man in the gray sweatshirt repeatedly shoot Owens before running toward Wolcott Street. Lola viewed a lineup at the police station the following day, but did not identify anyone because she had only caught a "glimpse" of the shooter and did not want to pick out the wrong person.

¶ 6 Amos Thompson testified that he owns the van in which defendant was found on the day of the incident. He loaned the van to Lorenzo Banks in the early morning hours of October 28, 1999, and he next saw it several days later at the police pound. When police questioned him on the day of the incident, he provided them with Banks' name and address.

¶ 7 Chicago police officer Robert Haile testified that he and his two partners set up a surveillance near Banks' home on the day of the incident. About 30 minutes later, they "curbed" a van matching the description of the getaway vehicle. As the officers approached the van, Officer Haile saw a handgun "come flying" out of the rear passenger window. The officers detained the four men inside of the van: William Jackson, the driver; Banks, the front seat passenger; Marlon Hayes; and defendant, who was sitting on a gray sweatshirt in the rear passenger seat behind the driver. Officer Haile then recovered the gun, which was later inventoried.

¶ 8 Forensic investigator John Stout testified that he processed the van at issue, and, in doing so, recovered, *inter alia*, a gray, hooded sweatshirt and gloves that were inside a pouch of the sweatshirt and later inventoried. He further testified that he conducted a gunshot residue exam on defendant while his partner conducted exams on Banks, Hayes and Jackson. These exams were inventoried and routed for lab analysis.

¶ 9 Forensic scientist Peter Brennan testified that he specializes in firearms identification and described the procedures he followed in analyzing the gun and two gun cartridges that were recovered on the scene in this case. In his opinion, those two cartridges were fired from that gun "to the exclusion of any other firearm."

¶ 10 Forensic scientist Robert Berk testified that he performed tests on the four gunshot residue kits in this case. He described the procedures he followed in doing so and stated that the results of defendant's kit reflected normal hand blank limits, meaning that he was not involved in the discharge of a weapon, that the weapon that was discharged did not emit sufficient residue in order to test positive, or that he was able to remove the gunshot residue from his hands prior to the test being taken. On cross-examination, Berk testified that he also tested the kits of Jackson and Hayes, whose results also indicated normal hand blank limits, as well as Banks, whose results were inconclusive.

¶ 11 Latent print examiner Jennifer Barrett described the procedures she followed in examining a gun, a magazine, four cartridges and two shell casings in relation to this case, and she testified that she was unable to recover any suitable latent impressions on those items.

¶ 12    Chicago police detective John Posluszny testified that he conducted a lineup on the day of the incident as well as the following day, and that defendant, Banks, Jackson and Hayes participated in both lineups.

¶ 13    The parties then stipulated that defendant was stopped in the van at 802 East 75th Street in Chicago, Illinois, at 2:43 p.m. on October 28, 1999. The parties further stipulated that, if called to testify, Officer Haile would state that in a supplementary report he wrote that he saw a bluesteel handgun fly from the passenger side of the vehicle and land on the curb.

¶ 14    Defendant testified that about 2 p.m. on the day of the incident, he was walking to a gas station on 76th Street and Cottage Grove to buy cigarettes, when he encountered his friends Jackson and Banks, and accepted their invitation to drink with them in their van. Jackson was the driver, Banks was in the front passenger seat, and defendant sat behind the driver's seat; no one else was in the van at that time. They drove around listening to music, and when the van was later stopped by police, defendant did not know what was going on. At that time, he saw Banks throw a gun out of the front passenger window and did not know where the gun came from. On cross-examination defendant acknowledged that he was sitting on a gray sweatshirt in the van, but he stated that it did not belong to him. He further stated that he did not recall telling police that Banks had been driving the van or that he, Banks and Hayes picked Jackson up from a liquor store.

¶ 15    In rebuttal, the State called Detective Posluszny, who testified that after defendant was arrested and advised of his rights, he stated that Banks had been driving the van and that they met Jackson at a liquor store.

¶ 16    The jury found defendant guilty of first degree murder and he was subsequently sentenced to 36 years' imprisonment. On direct appeal, this court affirmed that judgment after granting appellate counsel's motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). *People v. Smith*, No. 1-01-3188 (2002) (unpublished order under Supreme Court Rule 23). In doing so, we also considered defendant's *pro se* claims and found that the identification testimony presented at trial was sufficient to prove him guilty beyond a reasonable doubt, and although no gunshot residue was found on his hands, that a pair of gloves was found in the pocket of "defendant's sweatshirt." *Id.* at 2.

¶ 17    Defendant subsequently filed a *pro se* postconviction petition, after which counsel was appointed to represent him. Postconviction counsel then filed an amended petition, alleging, *inter alia*, that pursuant to section 116-3 of the Code, defendant is entitled to DNA testing on the sweatshirt and gloves. Pursuant to the circuit court's request, postconviction counsel filed a separate motion on that issue. After a hearing thereon, the circuit court denied the motion, finding that defendant failed to show that the DNA testing would reveal evidence materially relevant to his assertion of actual innocence, in light of the eyewitness evidence presented against him at trial.

¶ 18    In this appeal, defendant contends that the trial court erred in denying his request for DNA testing on the sweatshirt and gloves because the testing requested has the potential to produce noncumulative evidence materially relevant to his claim of actual innocence. We review a denial of a postconviction request for forensic testing *de novo*. *People v. Shum*, 207 Ill. 2d 47, 65 (2003).

¶ 19    Section 116-3 of the Code delineates the prerequisites a defendant must meet in order to establish that he is entitled to, *inter alia*, postconviction forensic DNA testing. 725 ILCS 5/116-3 (West 2010). In relevant part, defendant must first show that his request for forensic

testing relates to evidence that was secured in relation to the trial which resulted in his conviction, and that this evidence was (1) not subject to the testing which is now requested at the time of trial, or (2) although previously subjected to testing, that it can now be subjected to additional testing utilizing a method that was not scientifically available at the time of trial. 725 ILCS 5/116-3(a)(1), (2) (West 2010).

¶ 20    The State maintains that defendant cannot get past this initial hurdle because he has failed to show that the requested DNA testing was unavailable at the time of trial. We disagree. Although a prior version of the statute imposed such a limitation as to all evidence at issue (725 ILCS 5/116-3 (West 2006)), the statute has subsequently been amended, separating evidence into two classifications; evidence that was not subjected to the testing now requested at the time of trial, and evidence that had previously been subjected to testing but can now be subjected to additional testing (725 ILCS 5/116-3(a)(1), (2) (West 2010)). In its current form, if the evidence at issue was not subjected to the requested testing at the time of trial, section 116-3 does not require that that type of testing not have been scientifically available at that time. 725 ILCS 5/116-3(a)(1), (2) (West 2010); *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 6; *People v. Pursley*, 407 Ill. App. 3d 526, 531 (2011). Here, the State concedes that the gloves and sweatshirt were not previously subjected to DNA testing.

¶ 21    In this respect, we find the case at bar distinguishable from *People v. Barker*, 403 Ill. App. 3d 515, 520-21 (2010), cited by the State, where the evidence which defendant sought to be tested had been subjected to DNA testing at the time of trial. As such, defendant in *Barker* was subject to section 116-3(a)(2), which requires that defendant show that the requested testing was not available at the time of trial, and not to section 116-3(a)(1), which does not contain such a requirement. 725 ILCS 5/116-3(a)(1), (2) (West 2010). Further, to the extent that our decision in *Barker* implies that the unavailability element applies to all evidence, regardless of whether it had previously been subjected to testing, we note that our citation was to the prior version of the statute, which indeed contained that limitation. *Barker*, 403 Ill. App. 3d at 524. This is not the case under the current version of the statute.

¶ 22    Defendant must next present a *prima facie* case that identity was an issue at his trial and that the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect. 725 ILCS 5/116-3(b) (West 2010). If defendant does so, section 116-3 provides that the court shall allow the requested testing, provided that it determines that (1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to defendant's assertion of actual innocence even though the results may not completely exonerate him, and (2) the requested testing is generally accepted in the scientific community. 725 ILCS 5/116-3(c) (West 2010).

¶ 23    Here, the State concedes that defendant has established a *prima facie* case that identity was an issue at his trial and that the gloves and sweatshirt have been subject to a proper chain of custody. The State maintains, however, that the trial court correctly found that defendant failed to show that the requested testing had the potential to produce evidence which is materially relevant to his claim of actual innocence.

¶ 24    Evidence which is materially relevant to a claim of actual innocence is evidence which tends to significantly advance that claim, and, pursuant to the express terms of the statute, need not completely exonerate a defendant. *People v. Savory*, 197 Ill. 2d 203, 213-14 (2001). In determining whether evidence is materially relevant to defendant's claim of actual innocence,

we may consider the evidence introduced at trial, in addition to assessing the evidence defendant is seeking to test. *Savory*, 197 Ill. 2d at 214.

¶ 25 Here, defendant was connected to Owens' shooting through Sheila's identification of him as the shooter and Turner's identification of him as the person she saw escaping in a van shortly after the shooting. Evidence was presented that the shooter was seen wearing a gray sweatshirt, and, about an hour and a half after the shooting, defendant was found sitting on a gray sweatshirt in a van matching the description of the getaway vehicle and from which the murder weapon was thrown. An investigator discovered a pair of gloves inside a pouch of the sweatshirt. That said, no forensic evidence linked defendant to the crime, as no suitable fingerprints were available for analysis, defendant's gunshot residue test yielded results within normal limits, and the sweatshirt and gloves were not submitted for forensic testing. Defendant made no incriminating statements to police or other witnesses, and he denied his involvement in the shooting and denied that the gray sweatshirt belonged to him.

¶ 26 At trial, and in this appeal, defendant argues that Banks, and not he, was the shooter, pointing out that Banks' gunshot residue test yielded inconclusive results, that Banks was the one who borrowed the van in question, and that he testified that he saw Banks throw the murder weapon from the front passenger window of the van. Defendant maintains that if DNA testing of the sweatshirt and gloves reveals that his DNA was not present, but that Banks' DNA was present, it would strongly support his defense theory that Banks was the shooter, thereby significantly advancing his claim of actual innocence.

¶ 27 In response, the State argues that, at best, the testing defendant seeks would show that someone else touched the clothing, which would not overcome the credible identifications made of him by Sheila and Turner, and the consistent testimony of other witnesses, and thus would not be materially relevant. In so arguing, the State relies on *People v. Barrow*, 2011 IL App (3d) 100086, ¶ 32, *People v. Gecht*, 386 Ill. App. 3d 578, 584 (2008), and *People v. Urioste*, 316 Ill. App. 3d 307, 318 (2000), cases in which the reviewing courts found that the requested DNA testing would not be materially relevant. In *Barrow*, defendant made incriminating statements to an acquaintance in which defendant recounted how he committed the crime. *Barrow*, 2011 IL App (3d) 100086, ¶ 7. The reviewing court relied heavily upon these statements in finding that the requested testing would not materially advance defendant's claim of actual innocence. *Barrow*, 2011 IL App (3d) 100086, ¶¶ 29, 32. Similarly, the defendant in *Gecht* made incriminating statements to police, which the reviewing court relied upon in determining whether the requested DNA evidence was materially relevant. *Gecht*, 386 Ill. App. 3d at 580, 583-84. Finally, in *Urioste*, not only did the defendant make incriminating statements to police, but he relied upon an insanity defense at trial, which, the reviewing court found, made him ineligible to seek DNA testing under section 116-3, because identity was no longer at issue as he had admitted to committing the crime. *Urioste*, 316 Ill. App. 3d at 310, 316-17. Here, in contrast, defendant made no such incriminating statements, nor did he rely upon an insanity defense. Thus, the reasoning employed in *Barrow*, *Gecht*, and *Urioste* is inapplicable to the case at bar.

¶ 28 Defendant, on the other hand, cites, *inter alia*, *People v. Savory*, 197 Ill. 2d 203 (2001), and *People v. Johnson*, 205 Ill. 2d 381 (2002), in support of his request for testing. In *Savory*, defendant was convicted of two counts of murder, and, at trial, the State presented evidence that defendant made inculpatory statements to three of his friends, that he made statements to police revealing knowledge of the crime scene that only the offender would have known, and that a pair of pants stained with blood matched the same blood type as one of the victims.

*Savory*, 197 Ill. 2d at 206-08. The trial court denied defendant's subsequently filed section 116-3 motion for DNA testing of the bloodstained pair of pants, and the reviewing court affirmed that order on appeal. *Savory*, 197 Ill. 2d at 208-09. In affirming the appellate court's order, the supreme court found that the requested testing would not materially advance defendant's claim of actual innocence. *Savory*, 197 Ill. 2d at 214. The court reasoned that the testimony regarding the possible source of the bloodstain on the pants was only a minor part of the State's evidence and that a far greater portion of its case consisted of defendant's knowledge of certain features of the crime scene and his inculpatory statements to three friends. *Savory*, 197 Ill. 2d at 214-15. The court also noted that the State concentrated on those aspects of the case during closing argument and did not mention the evidence regarding the bloodstained pants until rebuttal closing argument. *Savory*, 197 Ill. 2d at 215.

¶ 29 Following *Savory*, the supreme court decided *Johnson*, 205 Ill. 2d at 387, in which defendant was convicted of, *inter alia*, rape and attempted murder. In finding that the trial court erred in denying defendant's request for DNA testing of a Vitullo kit, the court reasoned, *inter alia*, that unlike *Savory*, defendant did not make damning admissions placing himself at the crime scene. *Johnson*, 205 Ill. 2d at 396. The court noted that the State presented a strong, but largely circumstantial, case and that the only direct evidence of defendant's guilt came from the victim's identification, and it found that a favorable result on a DNA test of the Vitullo kit would significantly advance his claim of actual innocence. *Johnson*, 205 Ill. 2d at 396-97.

¶ 30 Here, as in *Johnson*, defendant made no inculpatory statements, and the State's case against him was largely circumstantial. Further, unlike *Savory*, the gray sweatshirt was not merely a minor part of the State's evidence against him, for the record shows that during closing argument, the State referenced the gray sweatshirt 19 times. Moreover, in affirming defendant's conviction on appeal, we placed significance on the pair of gloves found inside the sweatshirt, noting that no gunshot residue was found on defendant's hands, but a pair of gloves was found on "defendant's sweatshirt." *Smith*, slip op. at 2. This statement implies that defendant wore the gloves at the time of the shooting, thereby preventing gunshot residue from collecting on his hands, and that the sweatshirt belonged to him. Accordingly, we find that the gray sweatshirt and gloves were a central focus both at trial and on appeal, and, as such, a favorable result on a DNA test of these items could significantly advance defendant's claim of actual innocence. *Johnson*, 205 Ill. 2d at 396-97.

¶ 31 In reaching this conclusion, we have considered the State's argument that the testing cannot yield materially relevant evidence of actual innocence because the sweatshirt and gloves are not items of an intimate nature. In so arguing, the State attempts to minimize the significance of a scenario in which another person's DNA is found on the items at issue. In doing so, the State ignores the fact that defendant's argument does not center solely on the presence of another person's DNA on those items but, rather, on the ramifications of the absence of his DNA from those items. Further, although the State maintains that the requested DNA testing would not overcome the "unequivocal" identifications of defendant by Sheila and Turner, we observe that neither witness testified that she was previously acquainted with defendant and that requested DNA testing has been deemed materially relevant even where the victim was previously married to the defendant (*People v. Hockenberry*, 316 Ill. App. 3d 752, 754, 757 (2000)).

¶ 32 For the foregoing reasons, we find that the DNA testing of the gray sweatshirt and gloves requested by defendant is materially relevant to his claim of actual innocence and, accordingly,

reverse the trial court's order denying his section 116-3 motion. We remand this case so that the trial court may order DNA testing of the gray sweatshirt and gloves.

¶ 33   Reversed and remanded with directions.