2024 IL App (1st) 230876-U

SIXTH DIVISION

December 20, 2024

No. 1-23-0876

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 93CR1009401 |
| RODNEY WILLIAMS, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Diana L. Kenworthy, |
| | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Gamrath concurred in the judgment.

**ORDER**

¶ 1   *Held:*   We reverse and remand with instruction where: (1) the circuit court erred in denying defendant's renewed motion for DNA testing; and where (2) the court abused its discretion in denying defendant's request for discovery.

¶ 2    Following a 1997 jury trial, defendant Rodney Williams was found guilty of first degree murder of Mark Van Dyke and the attempted first degree murder of Vincent Bingham. Williams was sentenced to 95 years and 30 years respectfully, to be served consecutively. In 2014, Williams filed a motion for DNA testing of a coat left by the assailant at the scene of the shooting, but the matter was removed from the call. Subsequent motions for DNA testing were filed, but the coat could not be located.

¶ 3    Williams requested leave for discovery, and the circuit court denied both the motion for DNA testing and request for discovery. Williams now appeals the circuit court's denial of his renewed motion for DNA testing and the request for discovery arguing that: (1) the circuit court erred by denying his renewed motion for DNA testing because he established a *prima facie* case under 725 ILCS § 5/116-3 (West Supp. 2021); and (2) the court abused its discretion in denying his request for discovery. We reverse and remand both the denial of his renewed motion for DNA testing and request to conduct discovery, with instruction to allow discovery to aid in his efforts to locate the coat and that DNA testing be allowed if the coat is found.

¶ 4                                    BACKGROUND

¶ 5    A grand jury indicted Williams on 13 counts, including first degree murder (720 ILCS 5/9-1(a)(1) (West 1992)) and attempted first degree murder, (720 ILCS 5/8-4(1) (West 1992)) following the murder of Mark Van Dyke and the attempted murder of Vincent Bingham on February 5, 1992.

¶ 6    A jury trial began on January 14, 1997. Bingham testified that Williams shot him in the head and then shot Van Dyke twice in the head while they were driving on the west side of Chicago in the 500 block of Jackson Boulevard. He stated that Williams had been wearing a black coat which Williams removed while in the car. Bingham survived but was left paralyzed on the right side of

2

his face. Chicago police officers searched the car and recovered a coat in the backseat, which they inventoried.

¶ 7     In 1983, Bingham was charged with armed robbery and was sentenced to 13 years in the Illinois Department of Corrections. He was released in 1989. Dr. James Knoll, at the time the Director of Forensic Psychiatry at State University of New York, Upstate Medical University in Syracuse, testified that he reviewed Bingham's psychiatric records from the Illinois Department of Corrections and Bingham's hospital records from 1992. Dr. Knoll determined that from 1983 to 1989, mental health professionals had followed Bingham and observed a pattern: Bingham would become non-compliant with his psychiatric medications, particularly his anti-psychotic medications.

¶ 8     Bingham was diagnosed with schizophrenia, schizo-affective disorder, and major depression with psychotic features. Bingham would become psychotic, experience hallucinations, and become severely depressed. A psychotic level disorder was repeatedly diagnosed, meaning that Bingham would lose touch with reality, experience hallucinations, and hold false, unshakeable beliefs, known as delusions. Dr. Knoll explained that the records showed Bingham had been suffering from severe mental illness since the age of 14 or 15 and had been abusing drugs after his release in 1989.

¶ 9     During a police interview, Bingham identified his assailant as a light-skinned black male, aged 25-28, around 5'8" to 5'10", and weighing around 160 to 170 pounds. He stated his assailant wore an earring, had a pitchfork tattoo on his left arm, and had hair shorter than his own. However, Williams insisted that he was not wearing an earring, and the descriptions of the tattoo and hair length do not align with his appearance.

¶ 10   On cross-examination, Bingham testified that he was receiving disability payments for a "mental issue" and acknowledged he was placed in a psychiatric unit while being treated for his gunshot wound but denied taking any psychiatric medication during that time. Defense counsel also asked about Bingham's psychiatric treatment during his incarceration several years prior to the shooting. Bingham denied experiencing depression and claimed he did not hear voices during his earlier imprisonment.

¶ 11   Chicago police detective Hugh Conwell testified that Bingham remembered that Van Dyke referred to his assailant as either "Eric" or "Rick". Williams had also been known as "Ricky Shelton". Conwell produced a photo array to Bingham on December 23, 1992, where Bingham identified Williams. Bingham asked for a lineup so that he could see Williams in person. On March 24, 1993, Bingham identified Williams as the assailant in a lineup.

¶ 12   Frank Gurtowski, a Chicago police officer assigned to the Crime Laboratory division (the crime scene processing section) testified that he was called upon to process the crime scene on February 5, 1992. He examined the inside and outside of the car for fingerprints but found none suitable for comparison. He also examined a coat in the car but explained that he did not examine it for fingerprints because "It's cloth. You can't get a fingerprint from cloth." Furthermore, he would not have expected to find a fingerprint on the zipper of the coat because the zipper was not a large or flat surface.

¶ 13   On January 16, 1997, a jury found Williams guilty of first degree murder and attempted first degree murder. He was sentenced to 95 years for first degree murder and 30 years for attempted first degree murder, to be served consecutively.

¶ 14   In August of 2014, defense counsel (not current counsel) filed a motion for DNA testing to examine the coat that was left by the assailant in the car. The parties encountered challenges in

locating the coat. On May 5, 2015, after multiple court dates, the circuit court removed the matter from the call because the coat could not be located. On April 2, 2018, Williams filed a new motion for counsel to view, scan, and photograph impounded evidence and on April 6, 2018, the circuit court issued an order permitting the parties to inspect all impounded evidence in the case. Williams was subsequently notified that the coat could not be found.

¶ 15    On August 9, 2022, Williams filed a renewed motion for DNA testing. The court instructed the State to provide a detailed account of the efforts made to find the missing coat. In response, the State provided a written statement, though not a sworn statement, detailing investigations conducted over the span of eight years since Williams filed the original motion for DNA testing. The written statement outlined the following efforts: the Assistant State's Attorneys'(ASA) request for a copy of the impound order related to the trial exhibit; multiple contacts over several months with the Clerk's Office to locate the trial exhibits; they contacted the State's Attorney's Office evidence vault personnel; they reviewed the original court file and the appellate record multiple times; they reviewed the State's Attorney's trial file and post-conviction files; and they contacted the judge and one of the trial Assistant State's Attorney's in the matter to help locate the trial exhibits, but still could not find the coat.

¶ 16    On December 29, 2022, Williams requested the court to issue an order allowing him to initiate discovery to find the coat. The court heard arguments pertaining to the renewed motion for DNA testing and request to conduct discovery on February 24, 2023. Both the renewed motion for DNA testing and request to conduct discovery were denied. This appeal followed.

¶ 17                                JURISDICTION

¶ 18    The circuit court denied the renewed motion for DNA testing and the request to conduct discovery on February 24, 2023. Williams filed a motion to clarify and reconsider that was denied

5

on March 30, 2023. He filed his notice of appeal on April 28, 2023. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 7, 2023).

¶ 19                                              ANALYSIS

¶ 20    On appeal, Williams argues that: (1) the circuit court erred by denying his renewed motion for DNA testing after he established a *prima facie* case under 725 ILCS § 5/116-3 (West. Supp. 2021); and (2) the court abused its discretion in denying his request for discovery.

¶ 21    "When reviewing a trial court's ruling on a motion brought pursuant to section 116-3 of the Code, the appropriate standard of review is *de novo*." *People v. Hockenberry*, 316 Ill. App. 3d 752, 737 N.E.2d 1088 (2nd Dist. 2000). In relevant part, section 116-3(a)(1) states that "a defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of . . . forensic DNA testing . . . on evidence that was secured in relation to the trial or guilty plea which resulted in his or her conviction, and: (1) was not subject to the testing which is now requested at the time of trial. . .". 725 ILCS 5/116-3 (West. Supp. 2021). The record shows that the coat was not tested for DNA, which is now requested by Williams.

¶ 22    Section 116-3(b)(1) states that a defendant requesting DNA testing must demonstrate a *prima facie* case showing that identity was the central issue in the trial resulting in his conviction and the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect. *Id*. Hence, Williams must show that there was an issue at trial alluding to whether he was the offender or not and he must establish that there was a sufficient chain of custody of the evidence to be tested.

¶ 23    Williams contends that he satisfied the statute because his identity was the central and only issue in the trial which resulted in his conviction and the coat in question was admitted into

evidence and was subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect. 725 ILCS 5/116-3 (West. Supp. 2021). He asserts that a DNA test of the coat would potentially produce new, noncumulative evidence that is materially relevant to his innocence claim and the testing requested employs a scientific method generally accepted within the relevant scientific community. *Id*. In *People v. Urioste*, 316 Ill. App. 3d 309, 313 (2000), the court stated: "The clear purpose of section 116-3 was to provide convicted defendants with a means by which to establish actual innocence through advances in forensic technology. It was designed for the singular case where modern testing methods, not available when a conviction was obtained, could potentially discover new evidence that supports actual innocence in a decisive way."

¶ 24 The record supports the contention that identity was the central issue in this case, and the State concedes the point. First, the description Bingham gave to detectives did not match the appearance of Williams. Bingham told detectives the shooter had hair shorter than his at the time of the incident, but Williams had shoulder-length hair. Second, the State's case against Williams largely relied upon Bingham's eyewitness identification which occurred thirteen months after the shooting. Third, Bingham suffered from severe mental illness, abused drugs, and was admitted to a psychiatric ward shortly after the shooting.

¶ 25 The second step in establishing a *prima facie* case for DNA testing requires Williams to demonstrate that the evidence was subject to a sufficient chain of custody. The State argues that Williams cannot establish a *prima facie* case that the evidence in question has been preserved unaltered, as the statute requires, because it has likely been altered due to handling by numerous people. However, the State fails to recognize that the argument from Williams focuses not just on the presence of another person's DNA on the coat, but rather on the implications of his DNA's

7

absence from it. This court held previously, "the State attempts to minimize the significance of a scenario in which another person's DNA is found on the items at issue. In doing so, the State ignores the fact that defendant's argument does not center solely on the presence of another person's DNA on those items, but, rather, on the ramifications of the absence of his DNA from those items." *People v. Smith*, 2014 IL App (1st) 113265.

¶ 26 We find that Williams has presented a *prima facie* case because the evidence sought to be tested has remained in the State's control since the time of trial. "Our supreme court has held that a defendant's assertion that the evidence sought to be tested has remained in the State's control since the time of trial is sufficient to establish a *prima facie* case of sufficient chain of custody under section 116-3." *People v. Perez*, 2016 IL App (3d) 130784, ¶ 28 (citing *People v. Johnson*, 205 Ill. 2d 381, 394 (2002)). Hence, Williams does not need to prove that the evidence is still available for testing. *Id.*

¶ 27 Because we find that Williams established both that identity was a central issue in this case and the evidence sought to be tested was subject to a sufficient chain of custody, he has established a *prima facie* case. *Id.* Accordingly, "section 116-3 provides that the court shall allow the requested testing, provided it determines that (1) the result of the testing has scientific potential to produce new, noncumulative evidence materially relevant to defendant's assertion of actual innocence even though the results may not completely exonerate him, and (2) the requested testing is generally accepted in the scientific community." *People v. Smith*, 2014 IL App (1st) 113265 (citing 725 ILCS 5/116-3 (West 2010)). "To be materially relevant (evidence) to a defendant's claim of actual innocence, the evidence must tend to "significantly advance" his or her claim of actual innocence. A materially relevant determination requires an examination of the trial evidence, as well as the

evidence the defendant wants to test. But it need not by itself exonerate the defendant." *People v. Navarro*, 2015 IL App (1st) 131550.

¶ 28 The State argues that Williams cannot meet this additional requirement of section 116-3 because the testing would not produce materially relevant evidence that significantly advances his claims of actual innocence. The State contends that there are only four possible combinations of testing results: his DNA is, or is not, on the coat, and DNA from another person is, or is not, on the coat, and under these circumstances, none of these combinations would help Williams. If his DNA is on the coat, that inculpates him, if it is not on the coat, it could be due to deterioration over the more than 32 years since the crime, if no DNA is recovered from the coat it could mean, again, that previous DNA has deteriorated over time, and if a third parties DNA is on the coat, there is no way to know how or when this DNA was applied to the coat, given it cannot be located.

¶ 29 Williams responds that given the lack of physical evidence against him, the DNA testing would involve a comparison of DNA found on the coat to DNA profiles stored in law enforcement databases. *People v. Morrow*, 2022 IL App (1st) 200388, ¶ 52 (stating that the language of section 116-3(a) allows comparison of genetic profiles to those maintained in law enforcement databases). Furthermore, if a third party's DNA was found on the coat with no matching entry in the database, and his own DNA was absent, this would indicate the presence of an unidentified individual's DNA on the coat, giving rise to new and materially relevant DNA.

¶ 30 The record supports the contention that the State's case largely relies on Bingham's eyewitness identification. Bingham testified that the shooter was wearing the coat that was left in the back seat of the car. Due to the absence of physical evidence against Williams, we find that a DNA test of the coat, if it were to be found, could give rise to new and materially relevant evidence that could significantly advance his claim of actual innocence. See *People v. Smith*, 2014 IL App

(1st) 113265. We find this case involves the type of evidence that is repeatedly proven wrong by DNA testing, and that the Forensic Testing Act was enacted to provide those imprisoned based on such evidence the opportunity to prove their innocence. *People v. Urioste*, 316 Ill. App. 3d 309, 313 (2000). Even the circuit court judge acknowledged "I have someone in prison for murder who may or may not be the person that committed the crime."

¶ 31    Williams next claims the circuit court abused its discretion in denying his request for discovery. "A trial court has inherent discretionary authority to order discovery in post-conviction proceedings." *People v. Johnson*, 205 Ill. 2d 381, 408 (2002). The trial court should allow discovery only if the defendant has shown "good cause," considering the issues presented in the petition, the scope of the requested discovery, the length of time between the conviction and the post-conviction proceeding, the burden of discovery on the State and on any witnesses, and the availability of the evidence through other sources." *Id.* "A trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding and amounts to a 'fishing expedition.'" *Id.* However, we find the court abused its discretion in denying discovery because Williams has shown good cause and the burden on the State is not as significant as the court suggests. *Id*.

¶ 32    Using the balancing test from *Johnson*, we must determine whether the State's attempts to locate the coat were sufficient to satisfy the circuit court's decision to deny the request for discovery. See *Id.* The request is narrow and specific, focusing on locating the coat and obtaining DNA testing, which is crucial to his actual innocence claim. Contrary to the reasoning in *Johnson*, this request does not amount to a "fishing expedition", but rather is an appropriate inquiry into potentially exculpatory evidence. Even if the State has previously searched for the coat, the record shows Williams will use his own resources and independent efforts that could yield different

results. The mere fact that the State has been unable to locate the coat through prior efforts does not rule out the possibility that Williams could succeed now.

¶ 33   While DNA testing of the coat could indicate a perpetrator other than Williams, the length of time between his conviction and the post-conviction proceeding does not negate the potential value of locating the coat. The State claims that further discovery would not yield new information, however we find that is premature. The resources available to Williams in locating the coat may reveal information that was previously unavailable and denying this request would prevent Williams from fully investigating avenues to prove his innocence.

¶ 34   The circuit court judge asked for a detailed affidavit of the attempts the State made to locate the coat. On December 15, 2022, the Assistant State's Attorney provided a detailed accounting of the efforts to locate the missing coat. The written statement included the ASA's request for a copy of the impound order related to the trial exhibit, multiple contacts over several months with the Clerk's Office to locate the trial exhibits, contact with the State's Attorney's Office evidence vault personnel, a review of the original court file and the appellate record, a review of the State's Attorney's trial file and post-conviction files; and contact with the judge and one of the trial ASA's in the matter to help locate the trial exhibits. The written statement also included the previous motion for DNA testing from Williams in 2014, during which the State appeared in court multiple times: 3 times in 2014, 5 times in 2015, and 3 times in 2016.

¶ 35   We note that the ASA, as an officer of the court, always has an obligation to be truthful to the court. *People v. Resendiz*, 2020 IL App (1st) 180821, ¶ 48, citing *Chicago v. Higginbottom*, 219 Ill. App. 3d 602, 628 (1st Dist. 1991). Although the State provided a written statement detailing its efforts to locate the missing coat, the failure to submit a formal affidavit is a missed opportunity to affirm that the actions taken were truthful and accurate.

¶ 36   While the State's unsworn written statement provides an account of their previous efforts to locate the coat, the fact that these efforts did not result in the coat's discovery does not justify denying Williams the opportunity to conduct discovery. The coat is critical evidence in his actual innocence claim and Williams should not be denied further discovery in his attempts to locate it. Especially because the record indicates that Williams will use his own resources.

¶ 37   Williams advises that his counsel would (1) subpoena information as to who was the person instructed by the trial prosecutor to store and maintain this critical piece of evidence; (2) seek through subpoena who were the subsequent government officials or law enforcement officers in the chain of custody and what did each of these persons do with this evidence; (3) ask who currently or formerly in the Office of the State's Attorney or Clerk's Office can attest to the handling of this evidence; and (4) subpoena records of the storage and handling of this evidence.

¶ 38   Finally, while no other sources are available for obtaining the coat, further discovery may provide new information and denying Williams this opportunity would impair his ability to present his actual innocence claim.

¶ 39                                    CONCLUSION

¶ 40   Williams presented a *prima facie* case because identity was the central issue, and the evidence sought to be tested (the coat) remained in the State's control since the time of trial. The request for discovery is narrow and specific, focusing on locating the coat and obtaining DNA testing, which is crucial to his actual innocence claim. Accordingly, we reverse and remand the circuit court's denial of his renewed motion for DNA testing and motion for discovery, with instructions that Williams be granted discovery to assist in his efforts to locate the coat and DNA testing be allowed if the coat is found.

¶ 41   Reversed and remanded with instructions.