NOTICE
Decision filed 08/01/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230376-U

NO. 5-23-0376

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 88-CF-162 |
| | ) | |
| RICHARD C. NITZ, | ) | Honorable |
| | ) | Jeffrey A. Goffinet, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in denying the defendant's motion to allow DNA testing of a baseball bat where the testing did not have the potential to produce new, noncumulative evidence materially relevant to the defendant's claim of actual innocence.

¶ 2    The defendant, Richard C. Nitz, appeals from the circuit court's denial of his motion to allow DNA testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2022)). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    This case has a lengthy history dating back to the defendant's initial conviction for the murder of Michael D. Miley more than 35 years ago. The facts surrounding the offense are detailed in *People v. Nitz*, 143 Ill. 2d 82 (1991). An overview of the facts and procedural history necessary to an understanding of the issue raised on appeal follows.

1

¶ 5    During the early morning hours on April 10, 1988, a group of young people camping in a rural area of Southern Illinois, known as Rocky Comfort, discovered an abandoned vehicle with a burned interior. Some campers began to vandalize the vehicle. They smashed the windows, shot at the vehicle, and rolled it onto its roof. At that point, the trunk of the vehicle popped open, and the headless body of a white male fell to the ground. The campers notified the police. The deceased was identified as Michael D. Miley, and the abandoned vehicle was identified as Miley's vehicle. The Illinois State Police led the investigation into Miley's death, assisted by local law enforcement officers.

¶ 6    On May 6, 1988, the defendant was charged by information with the murder of Michael Miley. On June 2, 1988, the defendant was indicted on charges of first degree murder (counts I, II, and III), unlawful use of weapons by a felon (count IV), and felony murder (counts IX and X). The defendant's wife, Rita Nitz, was also indicted, but the cases were severed pursuant to Rita Nitz's motion. In September 1988, the defendant was convicted of first degree murder and sentenced to death. The Illinois Supreme Court affirmed the defendant's conviction and sentence. *Nitz*, 143 Ill. 2d 82. Subsequently, the defendant filed a petition for postconviction relief. The defendant alleged that during the time of his trial, he was taking a psychotropic drug called Tranxene, and he was not given a fitness hearing to determine the effect of the medication on his mental well-being and ability to stand trial. The supreme court reversed the defendant's conviction and granted a new trial because the trial court did not conduct a fitness hearing. See *People v. Nitz*, 173 Ill. 2d 151 (1996).

¶ 7                                    The Retrial—April 1998

¶ 8    During the retrial in April 1998, the State did not seek the death penalty. The State proceeded only on the three counts of first degree murder charged in the indictment. Each count

2

alleged that the defendant, without lawful justification, shot Miley with a gun and thereby caused Miley's death. The counts differed as to the mind-sets under which the defendant performed the acts.

¶ 9    Michael D. Miley was 23 years old when he was murdered. On April 6, 1988, at 8 p.m., Miley and his mother attended a scheduled choir practice at their church. Later that evening, between 9:30 p.m. and 10 p.m., Miley went to a gathering at Crab Orchard Lake. Miley was a member of the gay community in Carbondale, and members of the gay community sometimes met at Crab Orchard Lake for social events. Two of Miley's friends remembered seeing Miley at the lake that evening. They visited with him for about 30 minutes before they left. They did not know when Miley left or where he went after leaving the lake. At that time, Miley was living with his parents. He did not return to his parents' home that night. The next morning, Miley's parents notified the local police department that their son was missing. As detailed earlier, Miley's vehicle and his headless body were discovered at Rocky Comfort, a rural area about 20 miles from Crab Orchard Lake. Illinois State Police investigators searched the area for Miley's head, without success. Miley's head has not been found.

¶ 10   Dr. Beverly Tsai performed the postmortem examination on Miley's body. Dr. Tsai did not observe any bruises or other injuries to the body. She noted that the clean cut to the neck indicated that the head was severed after Miley died. Due to the missing head, Dr. Tsai could not provide a finding as to the cause of death.

¶ 11   Betty Boyer was a friend and neighbor of the defendant and his wife, Rita Nitz, and she occasionally watched Rita's son. On the evening of April 6, 1988, Betty Boyer went to the defendant's residence to babysit because Rita and the defendant were going out for the evening. Boyer recalled that the couple drove away in Rita's Plymouth Barracuda. The couple returned to

the residence about 20 minutes later. Rita went into the house and retrieved a gun from a box that was on top of the refrigerator. Rita then returned to the vehicle. As Rita reentered the vehicle, she handed the gun to the defendant, and they drove away. Sometime between 9:30 p.m. and 10 p.m., the defendant and Rita returned home. When Boyer heard their car pulled into the driveway, she stepped out onto the front porch. She saw another vehicle pull up and stop in front of the house. A young white man exited that vehicle. Boyer heard the defendant shout at the man. The defendant called the man a "faggot." The defendant told the man to leave, or he would kill him. As the young man began to walk away, the defendant retrieved a baseball bat from his own vehicle and approached the man from behind. The defendant swung the bat, striking the man in the head. The man fell to the ground. Boyer testified that the defendant repeatedly hit the man in the head with the bat, but her estimate as to the number of blows was inconsistent, varying during direct examination and cross-examination. Boyer watched the defendant and Rita lift the man and place him inside the trunk of the man's vehicle. The defendant and Rita left the premises in separate vehicles. Rita drove the man's vehicle, following the defendant's vehicle.

¶ 12    Danny Walker testified about a conversation he had with the defendant during a party at the defendant's home in early April 1988. During that conversation, the defendant stated that he killed a "faggot." The defendant stated that he shot the man in the head at Grassy Bottoms. The defendant explained that he cut off the man's head, put the man's body in the trunk of the man's vehicle, and then hid the head and the gun to conceal ballistics evidence. The defendant also stated that he dumped the man's vehicle, with the body secured in the trunk, at Rocky Comfort. The defendant removed the car stereo from the vehicle and then set fire to the vehicle's interior. When Walker expressed disbelief, the defendant took Walker to the site of the shooting and then to Grassy Bottoms. As they approached the area where the vehicle had been dumped, the defendant

4

observed police cars and an ambulance. The defendant commented that the authorities had already found the victim.

¶ 13    Michael Stearns testified that he had a conversation with the defendant in late April 1988, at a lounge in Carbondale. Stearns recalled that while he and the defendant were talking, the defendant stepped away to take a phone call. When the defendant returned, he appeared disturbed. Stearns asked the defendant if something was wrong. The defendant stated that he shot a "faggot punk" in the head after the man followed him home. The defendant told Stearns that he used a knife to cut off the man's head to get rid of the ballistics. The defendant stated that he stashed the body inside the man's car and buried the head. The defendant did not mention where he hid the gun, the head, or the vehicle containing the body.

¶ 14    Crime scene investigators searched for evidence in the area surrounding the abandoned vehicle. Investigators noted that there was some fire damage to the interior of Miley's vehicle and that the car stereo was missing. Investigators did not find a wristwatch, a wallet, or an identification card on or near Miley's body. During a search of the defendant's residence and vehicles, investigators discovered a Timex wristwatch that was identified as belonging to Miley. Investigators also discovered a car stereo of the same model that was removed from Miley's vehicle, along with several cassette tapes that Miley kept in his car. Additionally, investigators discovered clothing, shoes, and stereo speakers that had been purchased with Miley's credit card on April 7, 1988, and April 8, 1988. Employees of the stores where the items had been purchased testified during the trial. Those employees identified the defendant as the person who used Miley's credit card to make the purchases in a photo array and again at trial. The employees recalled that the defendant could not sign the credit card receipt because his hands were wrapped with ace bandages. The employees also identified the store receipts and recounted the items that had been

5

purchased. During the search, investigators also found a box for a semi-automatic pistol, with the gun missing, a set of Ace bandages, a shovel, a knife, and a wooden baseball bat. The bat was examined for the presence of blood and the presence of hair. Those tests were negative. The bat was not admitted into evidence.

¶ 15    During the defendant's case, one of the defendant's neighbors testified that he could not recall anything out of the ordinary occurring on the night of April 6, 1988. The neighbor stated that he did not hear any screaming, arguments, or gunshots that night. Friends of the defendant also testified that they did not know defendant to have hatred for homosexuals.

¶ 16    Following deliberations, the jury found the defendant guilty of first degree murder, finding that the defendant killed Miley, and that the defendant acted with knowledge that his acts created a strong probability of death or great bodily harm to Miley. The defendant was sentenced to natural life in prison. His conviction and sentence were again affirmed on appeal. See *People v. Nitz*, 219 Ill. 2d 400 (2006). Thereafter, the defendant filed a *pro se* postconviction petition and additional successive postconvictions petition that were denied.

¶ 17                              The Motion for DNA Testing

¶ 18    On January 17, 2023, the defendant filed a *pro se* motion to allow DNA testing of evidence pursuant to section 116-3 of the Code (725 ILCS 5/116-3 (West 2022)). The defendant sought an order allowing his expert to conduct DNA testing on the wooden baseball bat that was taken by investigators during the search of his residence and vehicles. The defendant asserted that identity was at issue at his trial, and that the baseball bat was subject to a chain of custody sufficient to establish that it had not been substituted, tampered with, replaced, or altered. The defendant also asserted that the requested "DNA-STR CODIS analysis" was widely accepted in the relevant scientific and legal communities. The defendant acknowledged that the baseball bat had been

6

subjected to forensic testing. He argued that the bat had not been subjected to the requested DNA testing which utilized a scientific method not available in 1988. The defendant claimed that the requested testing had the scientific potential to produce new and noncumulative evidence of his actual innocence. He argued that if the testing of the bat did not produce blood samples from the victim or the defendant, the absence of blood was evidence that would contradict Betty Boyer's testimony that the defendant repeatedly struck the victim in the head with a baseball bat.

¶ 19    In support of his motion, the defendant attached a letter dated September 14, 2022, from Dr. Karl Reich to the defendant. In the letter, Dr. Reich advised the defendant that some details needed to be considered before the defendant attempted to obtain forensic DNA testing on the wooden baseball bat. Dr. Reich noted that DNA degrades over time. Dr. Reich indicated that the chances of obtaining interpretable DNA profiles had decreased because the bat had been in storage for 34 years. Dr. Reich further indicated that if DNA was found on the bat, then the DNA profile from that sample would have to be compared to the defendant's DNA profile and the victim's DNA profile. Dr. Reich questioned whether a DNA profile could be obtained from the victim. Finally, Dr. Reich noted that it was likely that very little biological material could be collected from the bat, and therefore, there would need to be a discussion regarding sample consumption. The defendant also attached his own affidavit and averred that if his motion for forensic testing was granted, he would provide the resources and fees associated with the testing request, and he would retain private counsel to represent him in further proceedings.

¶ 20    The State filed a motion to strike the defendant's *pro se* motion and to sanction the defendant for filing a frivolous motion. The State argued that the defendant has filed three prior *pro se* motions for DNA testing of the baseball bat, and that the defendant's request for DNA testing has been decided and had not been appealed, and was, therefore, the law of the case.

¶ 21    The defendant filed a *pro se* response in opposition to the State's motion to strike. He argued that a defendant can request one or more tests where there is a reasonable basis for the testing and where the testing produces sound and reliable scientific evidence that is probative on an issue.

¶ 22    On March 23, 2023, the trial court issued an order on the defendant's section 116-3 motion for DNA testing and the State's motion to strike. After considering the written arguments, the court found that the defendant's motion was not frivolous and denied the State's motion to strike. Next, the court addressed the merits of the defendant's motion. The court noted that it had no evidence that the chain of custody for the baseball bat had been broken. In addition, after reviewing the record and the transcripts from the trial in 1988 and the retrial in 1998, the court determined that the baseball bat had not been subjected to DNA testing, and that identity was a central issue in the case. Nevertheless, after reviewing Dr. Reich's letter, the court could not find that the DNA testing had the scientific potential to produce new, noncumulative evidence as to the defendant's actual innocence claim. Based upon the exhibits offered, the court determined that there was no reasonable scientific potential to obtain biological material from the baseball bat after almost 35 years and that one of the expert's criteria for testing, *i.e.*, obtaining the victim's DNA, could not be met. For those reasons, the court denied the defendant's motion.

¶ 23    The defendant filed a motion to reconsider the trial court's order. The defendant asserted that the trial court erred in considering the possible results of the DNA testing. The defendant argued that he presented a *prima facie* case for DNA testing and that he was not required to establish the "foreseeability of the results prior to being allowed DNA testing." The defendant asserted that section 116-3 of the Code was essentially a discovery tool that allowed a defendant to develop newly discovered evidence to present in a postconviction petition. The defendant also

8

pointed out that section 116-3, by its plain language, was not limited to situations in which the scientific testing would completely exonerate the defendant. The defendant further argued that Dr. Reich did not totally foreclose the potential presence of DNA on the bat, and that the issue could only be resolved through DNA testing. The defendant asserted that the exculpatory scientific evidence underlying his actual innocence claim was in the possession of the State and that evidence has not been disclosed to him despite his repeated motions for DNA testing.

¶ 24    In response, the State argued that the trial court properly denied the defendant's motion. The State noted that where a defendant makes a *prima facie* showing that identity was an issue at trial and that the evidence to be tested was subject to a sufficient chain of custody, the trial court must then determine whether the results of the testing would materially advance a claim of innocence. In that process, the trial court must evaluate the evidence introduced at trial to see whether the testing would likely produce new, noncumulative evidence relevant to the defendant's claim of innocence. The State reasoned that there was ample evidence to support the jury's finding that the defendant was guilty of murdering Michael Miley, and that there was no further evidence to be obtained from the subject bat because there was no evidence that it was the bat used to subdue Michael Miley. The State also argued that the defendant's motion was barred by *res judicata*.

¶ 25    On May 8, 2023, the trial court denied the defendant's motion to reconsider. This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27    On appeal, the defendant claims that the trial court erred in denying his motion for DNA testing of the baseball bat pursuant to section 116-3 of the Code (725 ILCS 5/116-3 (West 2022)). The defendant claims that he presented a *prima facie* case that identity was at issue during his trial, that the chain of custody of the bat had not been broken, and that the bat had not been subjected to

9

DNA testing. He further claims that DNA testing of the bat has the potential to produce new evidence relevant to the defendant's claim of actual innocence.

¶ 28    A ruling on a motion for postconviction testing under section 116-3 is reviewed *de novo*. *People v. Stoecker*, 2014 IL 115756, ¶ 21. We review the trial court's judgment rather than its reasoning, and we may affirm on any basis supported by the record. *People v. Olsson*, 2015 IL App (2d) 140955, ¶ 17.

¶ 29    Section 116-3 of the Code provides:

"(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing, including comparison analysis of genetic marker grouping of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of other forensic evidence, and to those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial or guilty plea which resulted in his or her conviction, and:

(1) was not subject to the testing which is now requested at the time of trial; or

(2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results.

Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a *prima facie* case that:

(1) identity was the issue in the trial or guilty plea which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence (i) materially relevant to the defendant's assertion of actual innocence when the defendant's conviction was the result of a trial, even though the results may not completely exonerate the defendant, or (ii) that would raise a reasonable probability that the defendant would have been acquitted if the results of the evidence to be tested had been available prior to the defendant's guilty plea and the petitioner had proceeded to trial instead of pleading guilty, even though the results may not completely exonerate the defendant; and

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3 (West 2022).

¶ 30    The defendant contends that he presented a *prima facie* case for DNA testing of the baseball bat, and the State has not offered an argument to the contrary. After reviewing the record and the trial transcripts, we find that identity was an issue at the defendant's trial in April 1998, and that the subject baseball bat that the defendant seeks to test has been subject to a sufficient chain of custody. The record also reveals that while the bat was subject to some forensic analysis

11

in 1988, the bat was not subjected to the DNA testing that is now requested. *People v. Smith*, 2014 IL App (1st) 113265, ¶ 20.

¶ 31 Next, we consider whether the result of the testing has the scientific potential to produce new, noncumulative evidence that is materially relevant to the defendant's assertion of actual innocence. 725 ILCS 5/116-3(c)(1)(i) (West 2022); *Stoecker*, 2014 IL 115756, ¶ 26. Evidence that is materially relevant to a claim of actual innocence is evidence that tends to significantly advance that claim, and need not, standing alone, exonerate the defendant. *People v. Savory*, 197 Ill. 2d 203, 213-14 (2001). The determination of whether forensic evidence significantly advances a defendant's claim of actual innocence requires consideration of the evidence introduced at trial as well as an assessment of the evidence the defendant seeks to test. *Savory*, 197 Ill. 2d at 214.

¶ 32 Here, the defendant seeks DNA testing of a wooden baseball bat seized by the police during a search of the defendant's residence and vehicles. We have carefully reviewed the evidence introduced during the defendant's trial, held in April 1998. Our review of the record shows that the State's case rested on the detailed admissions that the defendant made to Michael Stearns and Danny Walker. Throughout the trial, and during closing arguments, the State focused on the testimony from Walker and Stearns that the defendant admitted he shot a "faggot" in the head, cut off the man's head, and then disposed of the head and the gun to conceal ballistics evidence. Walker testified that he and the defendant drove past the area where the defendant dumped the victim's vehicle and body, and that when the defendant observed the police cars and ambulances, he commented that they must have found the victim. The State's evidence also established that the defendant used the victim's credit cards to purchase several items of clothing, shoes, and a set of speakers. Those items were discovered during a search of the defendant's residence. The victim's watch, car stereo, and cassette tapes were also found during the search of the defendant's residence

12

and vehicles. The State also argued that Betty Boyer's testimony corroborated the testimony by Stearns and Walker in that Boyer saw Rita give a gun to the defendant and she saw the defendant strike a "faggot" and render him unconscious. The record reveals that the baseball bat was a minor part of the State's evidence. Boyer testified that the defendant repeatedly struck the victim in the head with a baseball bat; however, she gave wide-ranging and inconsistent estimates about the number of times the defendant struck the victim. A wooden baseball bat was also discovered during the search of the defendant's vehicle, but it was not admitted into evidence at trial. The bat was submitted to the crime lab for forensic analysis, but no hair or blood was found on the bat.

¶ 33    In sum, the defendant's guilt was based upon his inculpatory admissions to friends, his use of the victim's credit cards, and his possession of the victim's property. The baseball bat was not central to the State's evidence of guilt. Whether the defendant subdued the victim with the baseball bat prior to shooting him in the head was not necessary to the State's theory of the case. Even if, as argued by the defendant, the testing of the bat revealed no evidence of the victim's DNA or the defendant's DNA, that result would not significantly advance his claim of actual innocence. *Savory*, 197 Ill. 2d at 214-15. Having considered the evidence at trial and the evidence that may be provided through DNA testing, we conclude that the evidence the defendant seeks to test is not materially relevant to his claim of actual innocence

¶ 34                                III. CONCLUSION

¶ 35    For the reasons stated, we affirm the trial court's order denying the defendant's section 116-3 motion for DNA testing.

¶ 36    Affirmed.

13